No. 13,698.

## HART H. SANDOZ vs. EDWARD P. VEAZIE.

### SYLLABUS.

1. " Probable cause " does not depend upon the actual state of the case, in point of fact, but upon the honest and reasonable belief of the party prosecuting.

2. The question of " probable cause," as presented in an action for damages for alleged malicious prosecution, is a mixed one of fact and law, with which a jury, composed of men untrained in knowledge of law, is not unlikely to confuse the question of the guilt or innocence of the person, who, having been acquitted of the charge brought against him, seeks to recover damages for his prosecution.

3. " Where a party has communicated to his counsel all the facts bearing on the case of which he has knowledge, or could have ascertained by reasonable diligence and inquiry, and has acted upon the advice received, honestly and in good faith, the absence of malice is established, the want of probable cause is negatived, and the action for malicious prosecution will not lie." And, *a fortiori* is this the case where, the counsel consulted is the public prosecutor.

4. Actions of this sort have never been favored ; a clear case must be made out of a perversion of the forms of justice to the satisfaction of private malice and the wilful oppression of the innocent, in order to sustain them.

5. In this case, the evidence shows that the defendant, who is sued for damages for malicious prosecution, acted without malice and with probable cause, and upon the advice of the public prosecutor, before whom he had fairly laid the facts within his knowledge, and the verdict and judgment for the plaintiff are accordingly reversed.

A PPEAL from the Sixteenth Judicial District, Parish of St. Landry, Lewis, J.

*Lewis & Lewis, William C. Perrault, William J. Sandoz* and *Percy T. Ogden,* for Plaintiff, Appellee.

*Gilbert L. Dupre* and *E. B. DuBuisson,* for Defendant, Appellant.

The opinion of the court was delivered by

MONROE, J. This is an action in damages for an alleged malicious prosecution. The answer is a general denial.

The case presented by the record is, substantially, as follows, to-wit:

Plaintiff and defendant are natives of the parish of St. Landry, and residents of the town of Opelousas, the former being the tax collector

of the town and the latter a member of the bar. At the time of the occurrences out of which this litigation has arisen, the plaintiff was about thirty, and the defendant about fifty years of age. The plaintiff had a wife and three children, the youngest being an' infant, barely four weeks old, whilst the household of the defendant consisted of his wife, two daughters (the elder of whom was about sixteen years of age), and Eddie Hudspeth, about twenty years old, who was staying at defendant's house in order to attend school.

There appear to have been no social relations between the two men, or their families, but the defendant had lived for fifteen years upon a farm adjoining that upon which the plaintiff was reared; had known the latter from his childhood; and had, always, been on perfectly friendly terms with him. Upon the morning of Friday, May 12th, 1899, Miss Celie Dejean, also about sixteen years old, came from her home, some five miles out of town, to pay a visit of a few days to her friend, Miss Ludie Veazie, the elder of the defendant's two unmarried daughters, and, upon that evening, the entire family went, in separate parties, to an entertainment, given at the Opera House for the benefit of the public schools, and consisting of an amateur dramatic performance, with refreshments, followed by dancing, the two girls being escorted by John Harmonson, a distant cousin of Miss Veazie, and Eddie Dejean, a brother of Miss Dejean, Mrs. Veazie, who had charge of the refreshment table, taking her younger daughter with her, and the defendant taking Edd'e Hudspeth. As soon as the dramatic performance was over, the defendant and young Hudspeth returned home, and, after an improvised supper, the latter went to the house of Mrs. G. W. Hudspeth, near by, where, for the time being, he was sleeping for that lady's protection, and the defendant began his preparations for bed. About that time, the two girls returned, with their escorts, but the latter remained but a few moments, and, upon their departure, the girls retired, only, however, within a very little while, to arouse the defendant, who had fallen asleep, by the most piercing shrieks of distress and calls for aid.

It may be stated that the defendant's house, as we infer from the testimony, though no witness has described it, is a cottage, situated upon the northwest corner of two intersecting streets, and facing to the South. It has galleries, front and rear, and a yard, or lawn. There are, as we understand it, four rooms and a hall, down stairs, and two rooms upstairs, each of which latter has a dormer window upon its

North and South sides, respectively, and, possibly, a window in the gable end of the cottage. There is some lattice about the rear of the house, by means of which it is comparatively easy to reach the roof and to effect an entrance, or exit, into, and out of, the upstairs rooms, through the dormer windows upon the North side, and the exit may, also, be effected by jumping from the roof of the back gallery, or back rooms, down stairs, which is said to be about nine feet from the ground. The defendant occupied the front room down stairs, upon the East side, whilst the two girls occupied the room upon the same side of the house, upstairs. This room has, to some extent, the benefit of the street electric light at the corner, the rays from which enter, obliquely, through the front, or South, dormer window. Upon hearing the alarm, as heretofore stated, the defendant sprang up and called loudly for assistance, which brought into the house three negroes, named Smith, Jones and Beauchamp, who happened to be passing, and they accompanied or followed him upstairs. He found the door of the girls' room fastened upon the inside, and there was some delay in unfastening it, and a further delay, resulting from the fact that the knob of which the defendant had taken hold, came out, with the shaft attached, and was dropped upon the floor of the unlighted landing, outside the door. In the meantime, the indications of distress, inside the room, became, if possible, more pronounced, and the defendant continually assured the inmates that he would be with them in a moment. Finally, after several minutes, he succeeded in getting in, and he found Miss Dejean standing near the door, which she had just unfastened, and his daughter on, or near, the bed, which occupied the middle of the room, whilst the intruder, he tells us, was heard by him, though not seen, escaping through the North dormer window. All the witnesses who were present, with the exception of the negro Smith, who was not examined, concur in the statement that the two girls were crying and sobbing in a state of most intense excitement, and it is not claimed that any connected conversation took place at that moment. Exactly what was said, before, and after, the opening of the door, and subsequently, is regarded as of some importance, and will, a little later, be considered from that point of view. As a matter of fact, almost as soon as the door was opened, the defendant sent the negro, Jones, to the Opera House to hasten the return of Mrs. Veazie, and the negro, Beauchamp, a boy of fifteen, accompanied him, whilst the two frightened girls went down stairs, where Robert Chacere, a neighbor living

about a block away, whose family had been alarmed by the outcries, as also his wife and daughter, found them in the hall.  The defendant then came down stair, and, feeling impatient for the arrival of his wife, and doubtful, perhaps, as to the delivery of the message which he had sent, went in search of, met, and returned with, her, the girls being left in the meanwhile, with Mr. and Mrs. Chacere and their daughter.

It is necessary, now, to a proper understanding of the situation, that we should go back to a period antedating the evening upon which the above narrated events took place.  Miss Ludie Veazie testifies that for two or three months, the plaintiff had been forcing himself upon her attention in various ways; that he had spoken to, and attempted to get into conversation with, her, on several occasions; that he had followed her on the street; that he attempted to get her to go across the street from her home to an office, which he was in the habit of frequenting, upon the pretence that some one wanted to speak to her through the telephone; that he was in the habit of hanging about, and passing and repassing, her father's house, and coming to the fence and asking her questions, and trying to converse with her; and that, upon the evening in question, she and Miss Dejean being seated upon the gallery, the plaintiff passed by, and taking his seat upon the gallery of the office opposite, occupied himself with looking over the top of a newspaper at her and her friend until, at the suggestion of the latter, they retired within the house.  She further testifies that, later, upon the same evening, in going to a neighbor's, she found him passing in front of the gate; that, upon her return, he was standing upon the stable bridge "right next to the house," looking upstairs toward her room; that upon going to her room and finding Miss Dejean dressing her hair, she closed the window; and that he again passed the house, and was so intent upon watching the window that he missed his footing and fell into the ditch, at the corner.  She further testifies that she had complained of the plaintiff to her mother, and that her mother advised her to say nothing about it.  It is also in evidence that the matter had been brought to the attention of the defendant, by his daughter and by young Hudspeth, and that Hudspeth had suggested that he should speak to the plaintiff, but that defendant said that the banquette was free, and did not encourage him to do so.  This testimony is corroborated, in different particulars, and in a greater or less degree, by Eddie Hudspeth, Miss Dejean, and seven other disinterested

witnesses.    Beyond this, some ten days or two weeks before the night of the 12th of May, Mrs. Veazie brought the matter to the attention of the District Attorney, who, however, attached no importance to it and gave no advice.    Whether the witnesses who have testified on the subject were mistaken in the interpretation placed by them on the plaintiff's conduct, or whether they were not, the fact remains, that he had so conducted himself as to excite unfavorable comment, and to arouse a feeling of apprehension and distrust in the minds of defendant's daughter, and her young friend Miss Dejean, as, also, in the minds of other persons, who have testified, and in the mind of the defendant's wife; and the denial and explanations which have since been made by the plaintiff, to the satisfaction of two juries, had not, then, been demanded, and were still unmade.

Recurring, now, to what was said before, and after, the defendant obtained access to the room occupied by the two girls, all the witnesses concur in testifying that there were cries of distress proceeding from within; that Miss Ludie Veazie could be heard calling, "Papa come quickly, there is a man in the room," and that the defendant said, repeatedly, "I am coming," or "I will be with you in a moment."    The defendant and both the girls testify that she, also, said, "You are a white man and I know you," or words to that effect; and the defendant and his daughter testify that she said, "He is choking me," whilst Miss Dejean, though not mentioning the use of those words, states that, as a matter of fact, the man was choking her, and that she, Miss Dejean, pulled his hands away from her friend's throat.    As against this, the two negroes, Jones and Beauchamp, say that they did not hear the expression last above referred to.

After the door was opened, the defendant said to Miss Dejean, who was immediately before him, "Where is Ludie?" and, having located his daughter, said, "My children, you are safe, what is all this about, who has come into your room?"    and, a moment afterwards, to his daughter, "Wait till your mother comes."    The defendant testifies that the girls were sobbing and choking and were almost inarticulate, and said little, or nothing, that could be understood.    His daughter testifies that she said, "Oh Papa, I know"—when he interrupted her by saying, "Wait my child until your mother comes."    The two negroes testify that the defendant asked the girls who it was, and that Miss Veazie answered that she did not know who it was; that he was a tall, slim, man, dressed in black, and that he had a red handkerchief tied

Sandoz vs. Veazie.

over h.s nose, or tied across his face. After the defendant had left the house in search of his wife, there was some conversation between the girls and the Chaceres, who remained with them. Mr. Chacere testifies that in response to a question propounded by him, as to whether they had any idea who it was, they answered that they did not know, that he was a white man, tall and slim, wearing a blue coat, soft black hat and dark pants, and that he had a handkerchief over his face; that they were very much excited and were crying, and that, when Mrs. Veazie arrived, her daughter, "as soon as she saw her mother, it looked like she wanted to say who she thought it was," but that her mother told her not to say unless she was certain, "to mention no name," and that the daughter said, "You know he has a grudge against me, he hates me." Being asked: "In addition to what you have already stated, I will ask you if she did not say, also, 'Mamma, it is the man I have been talking to you about,' or words of the same import?" To which the witness replied, "I don't remember that." Mrs. Chacere's testimony is as follows: "Q. Did they say anything about who it was? A. No, they did ·not recognize him; they said he had a blue coat and a slouch hat, that was the expression she used, and that he was a man that did not work; had soft hands; said they did not recognize him. Q. You are positive of that, that they both said they did not recognize the individual? A. Well, I cannot say exactly both, but I know Ludie said it. * * * Q. What conversation took place between Miss Veazie and her mother, after she arrived, in relation to the person? A. Well, Mrs. Veazie said, 'My God, Ludie, did you recognize him?' And I don't know what Ludie said—they were all excited. Q. Do you remember what Miss Ludie Veazie said to her mother about the. person? A. She said the same thing she told me; she told me he had a blue coat, slouch hat, and a handkerchief tied about his face. Q. Did she say anything about it's being a person who had a grudge against her? A. Yes, she told her mother, 'Mamma, it is the one who has a grudge against me.' Q. Well, what did Mrs. Veazie do then? A. She told her not to accuse any one unless she was positive; that is all I know. Q. Did she tell her not to mention any names; did you hear her say that? A. No. (Cross-Examination): Q. When you arrived, you found the young ladies in such a state of excitement that it was impossible for them to converse intelligently? A. Yes. Q. When Mrs. Veazie arrived, Ludie Veazie sa·d to her mother, 'It is the same man

who has a grudge against me'? A. Yes. Q. And her mother replied, 'Don't mention anybody, unless you are positive'? A. Yes, sir."

Miss Heloise Chacere's testimony is much to the same effect, thus: "They said they did not recognize anybody, but that he was a tall, slim man. Q. Did they say anything about his being disguised? A. Yes sir, said he had a handkerchief tied over his face and a hat pulled over his eyes. Q. Which one of them said that, do you remember, or both of them agreed to that? A. I know Ludie said that, I am positive she said that. Q. Was Miss Celie Dejean present when she said that? A. Yes sir. Q. She did not claim to have recognized the man did she? A. She said she did not recognize him. Q. What did Mrs. Veazie say after she arrived? A. She asked her daughter if she had recognized him? Q. What did she say? A. She said no; she told her mother that she did not recognize him. Q. Well, did she say anything while talking to her mother about the one that had a grudge against her, that hated her? A. Yes sir, said it was the one that hated her, had a grudge against her, at least. Q. Well, what did the mother say or do then? She told her to hush—told her not to say that."

It is quite clear that the defendant did not hear what took place while he was absent from the house, looking for his wife, and he denies having heard, upon his return, or at any other time, either of the girls say she had not recognized the intruder. His statement, upon the contrary, is, that when his wife entered the house, she said, looking at her daughter, "what is this?" and that the latter replied, "Mamma, it is the man I have been telling you about," and that his wife said, "Mention no names." Miss Dejean positively denies that she ever said to anybody that she did not recognize the assaillant, and asserts, with equal positiveness that the plaintiff was the man, and that she recognized him at the time. Miss Veazie's testimony, or rather Mrs. Albert Dejean's, as she has since been married, is to the same effect, and, in testifying as to her conversation with the Chaceres, she says, "I did not say to them I did not recognize the man, but I did say that he was a tall man, had on a dark coat and hat pulled down over his eyes, and that he was a white man. I never said anything about dark pants and a handkerchief over his face." She also testifies that she did not say, "It's the man that has a grudge against me, you know he hates me," but that she did say, to her mother, "Oh, mamma, I know the man,

it's the same man I have been telling you about," and that her mother told her to keep quiet.

Resuming the thread of the narrative, and pretermitting some little conversation between the defendant and his wife, when he informed her of what had happened, to which the objection of the plaintiff's counsel was sustained:—Upon the arrival of Mrs. Veazie, W. S. Frazee, the sheriff of the parish, was sent for, and the defendant got his buggy, and, calling for Eddie Hudspeth, drove a mile or two into the country, to Willie Burr's, to get bloodhounds to assist in trailing the miscreant who had entered his house, but was unsuccessful in the effort; and other efforts in that direction were also unsuccessful. Mr. Frazee, the sheriff, responding to the call made upon him, reached the house in about an hour, and states that neither of the girls, at that time, claimed to have recognized their assailant, though they agreed that he was a tall man, wearing a dark felt hat, and a dark coat, with a handkerchief over the lower part of his face, but that, the same morning, having gone home and returned, he asked Miss Veazie "if she did not have some suspicion as to who the person might be," and he states, "She was patting her foot, and, looking down, remarked, 'A person may suspect, but ———,' and, at this point, she stopped—whether some one interrupted her or not, I do not remember." He also testifies that, early the next morning he examined the roof and lattice, and found no marks indicating that anyone had escaped from the house through the North dormer window, although the roof was covered with dust, upon which the imprint of his finger was plainly visible. He further testifies that, at the suggestion of Mrs. Veazie, he looked for marks, said to have been left by the assailant upon the neck of Miss Dejean, but found none, and, upon the person of Miss Veazie, where he found marks, but he was apparently skeptical as to their origin. Some days later, Sheriff Broussard of Lafayette, having been called to assist in the matter, he and Sheriff Frazee interviewed Miss Dejean at her home in the country, and they testify as follows with reference to her statements as to the identity of the person who entered her room, to-wit:

W. S. Frazee, examined by commission: "Q. Did not Celie Dejean tell you and Sheriff Broussard that she identified the plaintiff as the party who entered her room? A. She said on that occasion that she thought it was the plaintiff, at the time the thing occurred. Q. Did not Celie Dejean, on the trial of the case of State of Louisiana vs. Hart H. Sandoz, again identify the plaintiff as the party who entered her

room? A. She did. Q. On taking the witness stand as a witness, yourself, did you not state that the testimony she had just given, in State vs. Sandoz, was, substantially, the same she had given you and Sheriff Broussard, and did not sheriff Broussard who followed you as a witness, corroborate your testimony? A. Yes, such is my recollection. She testified on the stand, substantially, the same as she had to us in the country."

I. A. Broussard, examined under commission: "Q. Please state, in detail, all she said she knew as to the burglary at the Veazie house? A. She stated that herself and Miss Veazie and two young men had gone to the Opera House in Opelousas the night of the alleged burglary. After the play, Miss Veazie was suffering from headache and they went home with their escorts. Mrs. Veazie, who was also at the Opera House, told her daughter that she could go home, as her father was at home. When they arrived at the house, the two escorts left them, and she, Miss Dejean, started to go upstairs to her bed room, when she heard something, that is some noise in her room. She ran down stairs and told Miss Veazie of what she heard. They both went up. When they got in their room they looked around, and saw nothing. They then thought is was, possibly, a cat. They undressed and went to bed, and only a few minutes after they were in bed, Miss Veazie told her that she was going to sleep, that her head hurt her. She said that a few minutes after, she saw a man standing in the window which leads to the roof of the dining room. She thought at first it was possibly the shadow of a man that was caused by the effect of the electric light. She paused a second before speaking. At that moment the man moved from the shadow of the window out where the electric light reflected on him. But before the man moved into the light, she said to Miss Veazie that there was a man in the room. Miss Veazie answered by saying, "Don't scare me, Celie, I have a headache." When the man moved out in the light, she then screamed. "There is a man in the room! There is a man in the room!" She and Miss Veazie screamed as fast and as loud as they could, calling on Mr. Veazie to come. At the same time the man sprang on the bed and was trying to choke them both. In the scramble she succeeded in getting loose, and started to raise the latch, which was inside the room, so that Mr. Veazie, who was then knocking at the door, could get in. At that moment she heard Miss Veazie wheezing as if being choked to death. She then ran back to the bed, grabbed his hands and pulled them loose from

Miss Veazie's throat, and then ran to the door and unlatched the door. The man, then, at that time, ran out through the window. Mr. Veazie then came in and got hold of us and told us not to cry, that 'Papa is with you.' Sheriff Frazee then asked her if she was sure it was a man. She answered by ask'ng Sheriff Frazee if he thought she was a fool. He said: 'No, but I once heard of a lady who was dreaming that there was a man in her room, who screamed and created great excitement and when assistance came, it was found that she was dreaming.' He further stated to her that he only asked her this question and made this statement to show her how people could be deceived sometimes and that he did not want to make any mistake. Myself and Broussard are out here this morning in regard to this matter, and we want you to be sure, as we don't want to have any innocent man in trouble.' She said that from the moment she saw the man in the room, she thought it was Hart Sandoz. I asked her how did she know it was Hart Sandoz. She said that when he stepped in the light she recognized him by his build, his clothing. She said she had seen him that evening, just before dark, looking into her room from the street. She said that she had seen him at different times, and very often, and that she knew him well, and that she knew it was Hart Sandoz, and that she was sure she was not making a mistake. She said that she was sure that Miss Veazie also recognized him."

There is no doubt that Miss Ludie Veazie informed her mother, upon the night of the occurrence, that she had recognized Hart Sandoz, and the defendant testifies that he heard the statement, as does also Eddie Hudspeth, and, it is equally beyond question that the same information was imparted upon the next morning, Saturday, May 13th, to the prosecuting officer of the parish. Upon the Monday, following, Miss Dejean returned to her home and told her mother that it was Hart Sandoz who had entered the room. Her mother warned her that she must not swear that it was Hart Sandoz unless she was sure of it, and she replied, "Mamma, I know it was him."

The defendant states that, in view of the doubts, which he thought might arise as to the possibility of identification, under the circumstances, he considered it prudent to obtain such further information as he could before bringing a charge, either formally or informally. He therefore offered a reward of one thousand dollars for the conviction of the culprit; attempted, unsuccessfully, to secure the aid of detectives, called upon Sheriff Broussard of Lafayette, and C. C. Duson

of Acadia, through Sheriff Frazee, to assist the latter in the investiga-
tion, and, for ten days, devoted himself to the inquiry, and that during
the whole of that time he consulted with the district attorney, gave him
all the information that he was able to obtain, and was governed by his
advice.

The District Attorney and Sheriff Broussard reached the conclusion,
and so advised the defendant,that the evidence was sufficient to secure
the conviction of Hart Sandoz, the present plaintiff.   Sheriff Frazee
was evidently of a different opinion, but gave no advice.   Mr. Duson
was unable to give more than superficial attention to the matter, and
says: "My examination was short, confined to an examination of
the room and questions I thought pertinent to the case; one visit only.
* * * I told him (Veazie) on this occasion, in my judgment, he could
not convict Sandoz, on the information he had given me."   The de-
fendant testifies that, finding that Duson was unable to go into the
investigation, he told him comparatively little about the case.

Pending the investigation, which was being prosecuted, it was deemed
advisable not to make public the name of the person upon whom sus-
picion rested, but Miss Ludie Veazie mentioned it to one of her school
girl friends, who mentioned it to others, through whom it reached the
ears of the plaintiff, that he was the person.   He immediately took steps
to trace the information to its source and, upon May 19th, wrote to the
defendant a letter in which he said, "I denounce as a liar and a scoun-
drel any man or set of men who use my name in connection with this
affair.   I don't know whether you are the author of this rumor or not,
but I warn you that unless they are stopped, I shall hold you personally
responsible."   To which the defendant replied:   "I am neither the
author nor the originator of the statement to which you refer.   A full
investigation by competent persons is now being made, and, when this
shall be completed, every one will know who is suspected, because
an affidavit will be made by me, in person.   At this time, as I am
acting in concert with the law officers, I decline to state what particular
person is under suspicion."

It is also shown that plaintiff was taking steps to bring about a
judicial investigation of the matter, when, upon May 12th, an affidavit
was made by the defendant, charging him with having, feloniously
and burglariously, entered his, defendant's, dwelling house, in the
night, with the intent to commit a further felony, specified in the affi-
davit, whereupon, he gave bond for his appearance.

The matter was brought before the Grand Jury, at its first meeting thereafter, in the month of September, following, and, upon September 12th, that body returned, "not a true bill." Thereupon, immediately, the District Attorney, of his own motion, without consultation with the defendant, and, as he testifies, upon the basis of the testimony which had been given before the Grand Jury, filed an information against the plaintiff, reiterating the charge contained in the affidavit of the defendant. The case was tried in October, the trial beginning on Monday and ending on Saturday night, the defense set up being, the plaintiff's good stand.ng and reputation in the community, and an *alibi*, consisting of the fact, supported by the evidence of his brother, who claims to have slept with him, and of a negro woman employed as a nurse for his wife and infant child, that he went home between eight and nine o'clock on the night in question and d.d not again leave there until the next day. There was some evidence to the effect that the brother was seen at the Opera House after the hour mentioned, and that the defendant was seen upon the street, but the jury evidently believed the witnesses for the plaintiff (defendant at that time), and, after deliberating for forty or fifty minutes, brought in a verdict of "Not Guilty." In May, 1900, this suit was brought, and, after another protracted trial, there was a verdict and judgment for the plaintiff from which the defendant has appealed.

## OPINION.

It is undisputed that the plaintiff was prosecuted, criminally, by the defendant; that he thereby sustained serious damage; and that the prosecution terminated with his acquittal. The plaintiff having thus been vindicated with respect to the original charge, it will be understood that, in recapitulating the facts thereto relating, it has not been the purpose of this court to question either the correcteness or the force and effect of that vindication. The inquiry which now presents itself is, whether the defendant had probable cause for instituting said prosecution.

"As respects a criminal prosecution, the following definition of probable cause is approved by many authorities, viz: A reasonable ground of suspicion, supported by sufficient circumstances, sufficiently strong in themselves, to warrant a cautious man in the belief that the person accused is guilty of the offence with which he is charged."

*Newell on Malicious Prosecutions*, 276.

Another definition, which we find in the syllabus of the brief of plaintiff's counsel, reads as follows: "Probable cause for instituting a prosecution, is such a state of facts, known to, and influencing, the prosecutor, as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, upon the facts within the party's knowledge, to believe, or entertain an honest or strong suspicion, that the accused person is guilty." Still another, found in our own jurisprudence, reads: "Probable cause means the existence of such facts and circumstances as would excite the belief in a reasonable mind that the plaintiff was guilty of the offence for which he was prosecuted. Rumors are not, but the representations of others is, foundation for such belief. And we may add that, when to the representations of others, the plaintiff has, by his own conduct, invited suspicion to himself, the defence is complete."

*Mosely vs. Yearwood et als.* 48 *Ann.* 338.

This court, quoting from Greenleaf, has also said: "Probable cause does not depend upon the actual state of the case, in point of fact, but upon the honest and reasonable belief of the party prosecuting." Barton vs. Kavanaugh, 12 Ann. 334. Plaintiff's counsel propound the theory that the two young ladies who were attacked and who were the only eye witnesses of the occurrence, were unable, at that time, to identify the assailant, and that they were, thereafter, induced, by the defendant, to swear that the plaintiff was the man. In support of this view, the counsel call our attention to the statements of the several witnesses who testify that both the young ladies admitted that they did not recognize the man. This testimony is, however, to be reconciled with that given by some of the same witnesses to the effect that they, or, at least, Miss Veazie, said: "It is the one that has the grudge against me." It will be remembered that the Chaceres were the first persons with whom they spoke after coming out of their room, and that each member of that family, whilst testifying to Miss Veazie's unqualified disclaimer of recognition, nevertheless admitted, in answer to direct and leading questions (propounded to Mr. Chacere only upon cross-examination), that she stated that she knew, or strongly suspected, who their assailant was. Thus, Mr. Chacere testifies, that "it looked like she wanted to say who she thought it was," but that she was stopped by her mother, who told her to mention no names. He further testifies: " She said: 'You know he has a grudge against me; he hates me'; and her mother stopped her right there—that it where it came in—her mother

told her not to mention any names." Mrs. Chacere testifies that she said, "Mamma, it is the one who has the grudge against me," and that she was stopped by her mother from mentioning the name. And Miss Heloise Chacere testifies to the same effect; and it seems doubtful whether either of the witnesses heard Miss Dejean make any statement on the subject. If, then, the two young girls were only prevented by the interposition of Mrs. Veazie from naming, in the presence of others, the person whom they had identified, or whom they suspected, and believed that they had identified, it stands to reason that they became more explicit when the neighbors had departed, or when they found an opportunity of speaking to Mrs. Veazie alone. And there can be no reasonable doubt that they then gave her the name of the plaintiff, as they did, the next day, to young Hudspeth and to Harmonson and to Hebrard, as the person who had entered their room.

The evidence in no manner connects the defendant either with the facts or with the processes of reasoning by which they reached their convictions, and he was confronted with the same problem which was afterwards presented to others, to-wit: whether the two girls had really recognized the plaintiff, or whether they had reasoned themselves into the belief, or had jumped to the conclusion, that it was he, from other circumstances, and apart from such actual recognition. Sheriff Broussard, a gentleman of long experience, investigated the matter thoroughly, interrogated those who were to be summoned as witnesses, as well for the defense as for the prosecution, and concluded that there was evidence sufficient to justify the prosecution. The information, within the knowledge of the defendant, and that which he was able to obtain, was, as we think, fairly laid before the prosecuting officer of the State, and he reached the same conclusion. And so convinced was he of its correctness, after he had heard the case, as presented to the Grand Jury (of course out of the presence of the defendant) that, simultaneously with the return of the *ignoramus,* and without the knowledge of the defendant, he filed an information reiterating the charge contained in the defendant's affidavit. In addition to this, it may be remembered that on the Monday following the Friday night in question, Miss Dejean left the house of the defendant and returned to her own home and her own parents, and we find absolutely nothing in the record to justify the inference that either she or they were interested in having her give any testimony to the injury of the plaintiff, and yet, she has appeared before the Grand Jury and two petit juries and has sworn,

positively, upon each occasion, that the person who entered the room occupied by herself and Miss Veazie was the plaintiff in this suit. And, in thus testifying, she has been fully and categorically corroborated by Miss Veazie, the only other person claiming to have been an eye-witness to such entering. Under these circumstances, and without discussing the other theories, propounded by the learned counsel for the plaintiff, which we find unsupported by the testimony, we conclude that there was probable cause for the prosecution of which plaintiff complains. We appreciate the fact that the Grand Jury, composed, no doubt, of honest and reasonable men, investigating the same question, reached a different conclusion, but, whether, upon a given state of facts, there is "probable cause," with respect to a particular prosecution, involves questions of law with which the training of the grand jurors may not have enabled them to deal intelligently. We also appreciate the fact that the plaintiff was acquitted by the petit jury of the charge brought against him, but that is apart from the present question, which is, not whether he was guilty, but whether the defendant had probable cause for believing, or suspecting, that he was guilty. We appreciate, too, the further fact, that the plaintiff obtained a verdict for $3000 in this case; but here, also, the jury was called upon, as was the Grand Jury, to deal with a mixed question of law and fact, and may have confused the question of probable cause with the question of guilt or innocence, and may have assumed that a failure to find a verdict in plaintiff's favor would detract from his vindication, or would imply that he had been entirely cleared, of the original charge. Such errors are not uncommon, as may be seen from the following, among many, cases, in which similar verdicts have been set aside: Grant vs. Deuel, 3 R. 17; Gerker vs. Viosca, 8 R. 150; Gould vs. Gardner, Sager & Co., 8 Ann. 12; Talbert vs. Stone, 10 Ann. 537; Gould vs. Gardner, 11 Ann. 289; Barton vs. Kavanaugh, 12 Ann. 332; Osborn vs. Moore, 13 Ann. 714; Pellonz vs. Bullerdieck, 13 Ann. 274; Blass vs. Gregor & Wilson, 15 Ann. 421; Murphy vs. Redler, 16 Ann. 1; Robertson vs. Spring, 16 Ann. 252; Hopkins vs. Garthwaite, Lewis & Miller, 28 Ann. 325; Dearmond vs. St. Amant, 40 Ann. 374; Sibley vs. Lay, 44 Ann. 936.

In conclusion, it may be said, in the language of Manning, Chief Justice, in Staub vs. VanBenthusen, 36 Ann. 470: " Actions of this sort have never been favored, and, in order to sustain them, a clear case must be established, where the forms of justice have been perverted to the gratification of private malice and the wilful oppression of the in-

nocent." See, also, Lavile vs. Bigueneaud, 15 Ann. 605; Godfrey vs. Soniat, 33 Ann. 919; Monroe vs. Lumber Co. *et als.*, 50 Ann. 147; Davis vs. Stewart *et als.*, 47 Ann. 383; Garnier vs. Barnard, *alias* Dumontier, 45 Ann. 1270; Brelet vs. Mullen, 44 Ann. 199.

For these reasons it is ordered, adjudged, and decreed that the verdict appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the defendant rejecting the plaintiff's demand with costs in both courts.

PROVOSTY, J., takes no part.

Rehearing refused.