(50 South. 787.)

No. 17,507.

HAMMAR v. J. B. & J. W. ATKINS.

(Nov. 29, 1909.)

MALICIOUS PROSECUTION (§ 21*)—DEFENSES—STATEMENT TO PROSECUTING OFFICER.

Where, in an action for damages for alleged malicious prosecution and false imprisonment, it appears that defendant had made a full and fair statement of the case to the prosecuting officer, and was guided by his instructions in making the affidavit upon which the prosecution complained of was based, there can be no recovery.

[Ed. Note.—For other cases, see Malicious Prosecution, Cent. Dig. §§ 40, 44; Dec. Dig. § 21.*]

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Action by G. F. Hammar against J. B. & J. W. Atkins. Judgment for defendant, and plaintiff appeals. Affirmed.

C. F. Mead and Looney & Scheen, for appellant. Hall & Jack, for appellee.

MONROE, J. This is a suit for damages for alleged malicious prosecution and false imprisonment, in which the defense is a general denial, coupled with the averment that defendant's action in the matter complained

124 LA.—29

of was taken in good faith and upon the advice of the district attorney of the parish of Caddo, given by that officer after he had been fully informed of the facts. There was judgment in the district court in favor of defendant, and plaintiff has appealed. The facts, as they appear from the transcript, are as follows: On January 26, 1907, J. B. & W. S. Atkins & Co. (of which concern J. W. Atkins was, perhaps, also a member) made a contract with J. S. Connelly, whereby they agreed to furnish certain gas land leases, gas wells, municipal franchises, and contracts for gas, and Connelly agreed to build certain pipe lines and to furnish $15,000 in money. The original contract was amended and modified, and it was understood that a corporation would be formed by which bonds would be issued, and that the parties who should advance money should receive the equivalent in bonds, together with stock of the company, in due proportion, as a bonus. Connelly sold a one-fourth interest in the contract to Geo. F. Hammar (plaintiff herein) in consideration of Hammar's furnishing the first $10,000 required for the building of the pipe line, and it was stipulated that:

"For all funds provided and paid by Geo. F. Hammar, he shall have bonds, when issued, or other negotiable evidence of indebtedness, of like character as that given to J. S. Connelly and his associates."

Connelly also interested O. J. McLane in the enterprise, and McLane advanced between $15,000 and $20,000, which were invested in pipes. McLane, however, became dissatisfied and concluded to sell out, and Atkins, Connelly, and J. W. Jolly (who had, by that time, taken an interest) gave him their note for $15,000 payable in 60 days and secured by (what purported to be) a pledge of the pipes which were on hand, the gas land leases, the wells, etc., in payment for his interest. There were some other agreements, the particulars of which need not be recited, and thereafter a corporation was organized

under the name of "Louisiana Gas Company," with Connelly as president, J. B. Atkins as vice president, Hammar as secretary-treasurer, and J. W. Atkins, Jolly, and McLane (the latter having reacquired an interest) as members (with the others) of the board of directors, and provision was made for the issuance of $100,000 of bonds in two series, payable, respectively, in 1908 and 1909. On August 14, 1907, before the bonds had been received from the engraver, the board of directors adopted a resolution reading as follows:

"Resolved that J. B. Atkins, vice president of this company, be hereby authorized to borrow a sum of money, not to exceed a total amount of $25,000, on such terms and conditions as he may deem to be to the best interest of this company, and to surrender as security for the payment of the amount so borrowed, such securities of this company as may be necessary and to him may be deemed best."

There were present at the meeting: Connelly, president; Atkins, vice president; Hammar, secretary-treasurer; J. W. Atkins; J. W. Jolly; and O. J. McLane—and the resolution was seconded by Hammar and unanimously adopted. The bonds did not arrive until about August 17th, and $15,000 of them were at once turned over to McLane, in satisfaction of the note held by him and the pledge by which it was secured, leaving $85,000 (of bonds), which, under the resolution of August 14th, were placed under the control of the· vice president, as securities of the company, to be used in borrowing money for its purposes. Considerable money had already been borrowed or negotiated for, on terms which required bonds as collateral security, largely in excess of the amounts obtained or to be obtained, so that, whilst the company was still sorely pressed for money, it had but few bonds at its disposal, and it would have had none had the different members of the company who were to receive bonds for their subscriptions demanded them. No such demand was made, however, at that

time, and the vice president of the company, acting under the resolution of August 14th, and, as he testifies, upon an understanding between the parties interested that they were to allow the bonds to which they were entitled to remain in the treasury, in order to tide the company over its difficulties, assumed that such bonds as were not actually pledged for loans already obtained were available as security for further loans; but he appears to have been unsuccessful in his· attempts to obtain money, in Shreveport, even with the bonds, and mentioning that fact, and the pressing need of the company, to Hammar, the latter suggested that, if $10,000 of the bonds were turned over to him, he might be able to borrow some money on them elsewhere.

Atkins testified on that point as follows:

"I had exhausted all of my means to obtain additional money, and we were still in need of funds to construct the pipe line, and I talked to Hammar about the matter, and was very much worried; did not see how we could go any further without additional money; told him that the banks here refused to lend money on the bonds; nor could I find any individual who would give any additional money. Mr. Hammar then remarked, he says, 'If you will turn over to me $10,000 of the bonds of the Louisiana Gas Company, I feel satisfied I can go to some city'—I think he said 'Iowa'—where he knew several banks and parties very well, and he felt satisfied he could raise $5,000 in cash to help us out of this trouble. We talked over the financial situation very fully, and I told him, if he could do that, it would relieve us very much, in the embarrassed circumstances we were under. We then went over to the First National Bank, and I got Mr. Byersdoffer to release $10,000 worth of bonds of the Louisiana Gas Company, and we came back to the office."

Upon returning to the office of the gas company, the bonds thus obtained from the bank were delivered to Hammar, who gave a receipt for them, and he then returned to the bank and exchanged the bonds that he had received for others. The receipt given by him reads as follows:

"August 23, 1907.

"Received from the Louisiana Gas Company ten gold bonds, of the value of one thousand dollars ($1,000) each, and numbered as follows: ·

1, 2, 3, 4, 5, 6, 7, 8, 9, and 10. These bonds are to be used as collateral security to borrow money. Said money so borrowed is to be placed to the credit of the Louisiana Gas Company, with the First National Bank of Shreveport, La., for the purpose of being used for pay rolls, constructive work, or for other matters in the ordinary course of business. * * * Exchanged above ten bonds with the First National Bank for bonds numbered 14–23, inc."

With regard to the exchange thus referred to, Atkins testifies that Hammar said that he wished to exchange the bonds that he had received for bonds bearing other numbers, and that, whilst he (Atkins) did not understand why, he made no objection. Hammar's explanation is that he had received from Connelly, the president of the company, an order for the $10,000 of bonds coming to him under the contract agreeably to which he had subscribed, and paid $10,000 to the company, and that the order called for bonds maturing December 1, 1909; whereas, the bonds that he had at first received were of a different series. Speaking of what took place at that time between him and Atkins, he says:

"The idea was this: I was going to Iowa, and I told them that I thought that I could raise some money on the bonds, so we went and got the bonds from Mr. Byersdoffer, and we got ten bonds—one to ten. Now, after we went over to the office, I told Mr. Atkins that I would go back and change the bonds, that I had an order for certain bonds, and that I would go and get those bonds and go to Iowa, and if I was successful in raising the money I would pledge them and, I would take other bonds in place of them, and we exchanged them. When we came back to the office, Mr. Atkins says: 'Here is a receipt I want you to sign.' Not having the order in my pocket, I did not think it was wrong to give a receipt. Consequently I signed the receipt."

The order to which the witness refers reads as follows:

"Carthage, Mo., August 3, 1907.
"Louisiana Gas Co., Shreveport, La.—Dear Sir: When executed, and bonds have been certified by the Conqueror Trust Company, of Joplin, Mo., deliver to G. F. Hammar, or order, bonds of the Louisiana Gas Company, of the following maturity: Ten thousand dollars of the issue maturing December 1, 1909.
"Yours very truly,
"By J. S. Connelly, President.
"Attest: G. F. Hammar, Sec.-Treas."

Atkins denies that Hammar told him of the possession of any such order, when the bonds were delivered to him, or that he knew of its existence until some time afterwards, and neither Hammar nor Connelly nor any other witness undertakes to testify to the contrary, save (as stated above) that Hammar says that he spoke of his having an order as his reason for wishing to change the bonds. He did not have the order in his possession at that time, however (having, as he says, left it at his home in Kansas), and no one pretends that Atkins had ever seen it. After obtaining the bonds, Hammar went away, presumably, to borrow money on them for the company, and was gone for, say, two weeks, and when he came back he was asked by Atkins whether he had been successful, and he replied that he had not. Atkins then told him that he (Atkins) was negotiating with a gentleman in Shreveport for a loan of $6,000, and asked where the bonds were, to which Hammar replied that he had them, or could get them in five minutes. When pressed to give them up, for the purposes of the proposed transaction, he said that he had left them in Iowa, pledged for $1,500 that he had borrowed for his own account. He was then asked to allow the company to pay the $1,500 and take back the bonds, which he declined to do; but, according to the testimony of Atkins, he gave that gentleman to understand that if, upon an examination of the Atkins' books, it was found that they had advanced to the company the money that they had agreed to advance, he would then lend his assistance. He does not say why, having agreed to use the bonds in order to borrow money for the company, he changed his mind and used them for his own purposes. His explanation of his signing the receipt is that he was in a hurry to catch a train and did not read it carefully. When he admitted that he had pledged the bonds for his own account, Atkins went to the office to examine the re-

ceipt that he had given, and found that it had disappeared, and that there had been substituted, in place of it, the order to which we have referred, and which, when found, bore the memorandum:

"Shreveport, La., August 28, 1909.
"Received bonds No. 14 to 23, inclusive, on account above order.
"[Signed]  G. F. Hammar."

Whether plaintiff, who as "sec.–treas." of the company, had access to the safe where the receipt was kept, made the substitution himself, or whether it was done, at his request, by the stenographer, is a matter about which there is some conflict in the testimony, and it makes no difference. It is undisputed that, after the substitution was made, plaintiff destroyed the receipt, and Atkins testifies that he told him that he destroyed it because he had no business to sign it.

Plaintiff says that having furnished the order, as a receipt to the company, it was not worth while to keep the receipt. Atkins also testifies that he never saw the order, or knew of its existence, until he found it in the safe, and that, the bonds having been intrusted to him by the company, he felt personally responsible in the matter and continued his efforts to induce Hammar to return them, but without success. He finally consulted a lawyer, and, having told him the facts, was advised that it looked like a case of embezzlement, but that he had better submit the matter to the district attorney, which he did, and that officer, after several interviews, and after having examined the various papers to which we have referred, instructed him to make an affidavit, which he did, charging Hammar with the embezzlement of the bonds. Thereupon, about December 13th, the sheriff, to whom a warrant for the arrest of Hammar had issued, telegraphed to the chief of police, at Parsons, Kan., where Hammar was then staying, requesting that the latter be held to await a requisition, and Hammar was arrested, charged with being a fugitive from justice, and, after spending the greater part of a night in arranging the matter, was released on bond, without having been incarcerated in prison. He employed counsel, who shortly, afterwards represented him before the Governor of Kansas in the matter of the requisition which had been granted by the Governor of Louisiana, and the Governor of Kansas declined to honor the requisition. Later still, say in January, 1908, the matter was taken up by the grand jury of Caddo parish, and an ignoramus was returned. This suit was instituted in April following.

No one denies that, under his contract, plaintiff was entitled to $10,000 of the bonds of the gas company; but at the time that he told Atkins that, if the latter would let him have $10,000 of the bonds, he thought he would be able to borrow money for the company on them, no particular bonds had been identified as subject to his claim. All the bonds (save the $15,000 which had been delivered to McLane) were held as the property of the company, either by Atkins, the vice president, acting under the resolution of August 14th, or by creditors of the company, who held them as collateral security for debts due by the company, and plaintiff did not demand and did not receive the bonds which were delivered to him as bonds to which he was entitled by virtue of his contract or by virtue of the order which had been given him by Connelly, but received them as the result of his own suggestion, that, if the bonds were placed in his hands, he thought he would be able to use them for the benefit of the company. He did not have Connelly's order in his possession at that time, and, of course, did not present it. Atkins denies that he mentioned it; but, whether he mentioned it or not, he signed a written instrument by which he acknowledged that he received ten bonds, not by virtue of such order, or of any

right evidenced thereby, but, to quote the language of the receipt:

"To be used as collateral security, to borrow money. Said money so borrowed, to be placed to the credit of the Louisiana Gas Company with the First National Bank of Shreveport, Louisiana, for the purpose of being used for pay rolls, construction work, or for other matters in the ordinary course of business."

Counsel for plaintiff argue that Atkins misrepresented matters to the district attorney in saying that the bonds which were delivered to plaintiff were released by the First National Bank, to which they had been pledged to secure a loan, when, in point of fact, the bonds were delivered to plaintiff on August 23d, and the pledge was not made to the bank until August 30th. The president of the bank testifies that the bonds of the gas company were deposited in the bank for safekeeping for some time prior to August 30th, and that upon that day the bank loaned the company $10,000 and received in pledge $51,-000 of the bonds. He further testifies:

"That the loan had been contracted for ten days or two weeks, perhaps, before the money was actually paid over; * * * that was brought about on account of an examination of the charter, contracts," etc.

And it is evident that the negotiations and contract for the loan were predicated upon the bonds then on deposit in the bank, or that were, unpledged, in the possession of the gas company. The material facts for the purposes of this case are: That the bonds belonged to the gas company, and not to the plaintiff; and, conceding that plaintiff was entitled to claim 10 of them, that the 10 delivered to him were not so delivered because, or in satisfaction, of such claim, but were delivered to him as the bonds of the company, to be used for its, and not his, purposes. From the testimony of the defendants, corroborated by that of the district attorney, it appears to us that they made to that officer a full and fair statement of the case, and we are of opinion that, having so done, they were justified in obeying his instructions, and cannot now be held liable for the consequences. Sandoz v. Veazie, 106 La. 202, 30 South. 767; Kirk v. Wiener-Loeb Laundry Co., 120 La. 830, 45 South. 738.

The judgment appealed from is, accordingly, affirmed.