Statement of the Case.
MONROE, J.
Plaintiff sues the two defendants named in the title for damages alleged to have been sustained by reason of the attachment of his property and the arrest of his person.
The facts, as we find them from the testimony adduced upon the trial, are as follows: .
In 1889, plaintiff and his brother, AVilliam Peterman, bought a quarter section (160 acres) of swamp land in section 9, on Honey Island, in Louisiana, near the Mississippi line, and at that time, in reply to a suggestion that he would have to have the lines run before he could cut any timber, plaintiff said:
“It didn’t make any difference. The claim was all he wanted.”
After the purchase was made, the two brothers started to build a sawmill, with tlie understanding that there was to be a partnership between them; but for some reason, not explained, the mill was not completed. Plaintiff, however, retained his interest in the land, and, as a matter of fact, a sawmill was being operated, at the time of the occurrences out of which this litigation has arisen, in the name of Peterman Bros., near Gainesville, Miss., about four miles distant from the land in question, though how long it had been operated does not appear. Plaintiff testifies that he was not interested in it, and that the business was that of his brother AVilliam and another brother by the name of Jules; but no one explains in what way plaintiff’s interest in the timber that the mill took from the tract of the land owned by plaintiff and AVilliam was accounted for, and it appears from William’s testimony that he and Jules “ran the mill machine for the Pelican Box Factory,” and from the testimony of Charles that he worked for the Pelican Box Factory in New Orleans. In November, 1906, Hutchinson, the land agent of the defendant company, whilst engaged, with a surveyor, in running the lines of land owned by the company on Honey Island, found that a great deal of timber had been cut from the land, and, among other things, he observed that a number of the big gum trees had been cut from the S. W. % of section 10, which immediately adjoins the S. E. % of section 9, owned by Charles and William Peterman, but that there had been no trees cut on their quarter section. A few days later, whilst still engaged in running lines, he heard the pop of a teamster’s whip coming from section 10, and, going, with his chainmen, in the direction of the sound, he found two men, Hall and Wood, with a wagon and team and some “big blocks” of wood on the wagon. He told them that the land belonged to Poitevant & Favre, and that they were trespassing. They replied that they were working for Peterman Bros, and the almighty dollar, by the day, and that they would not have anything to do with it (meaning that they did not care to get into trouble, or to assume any responsibility), and they agreed to, and did, unload the blocks. Shortly afterwards, William Peter-man called at Hutchinson’s camp, at night, and, informing Hutchinson that he had learned from the men that they had been stopped, said that, if they (the Petermans) had been cutting on the company’s land, they (meaning the Petermans) did not know it, and he asked Hutchinson what he had better do, to which Hutchinson replied that he had better go and see Poitevant & Favre and compromise the matter. Peterman thereupon called at the office of the company in New Orleans, and, according to his testimony, said (to Mr. Eads Poitevant, the secretary of the *711 company) that, if “they” (the Petermans) had cut any of the company’s timber, and the company would send a man to survey it, “they” would pay for it, to which Mr. Poitevant replied that Mr. Hutchinson had said that (speaking in the language of the witness) “we cut all of the timber,” whereupon Peterman said:
“If that is the case, we will trade land with them, ours for theirs.”
Poitevant, being asked, “What was the objection to your acceptance of the offer of compromise?” replied:
“The land that he offered was not equivalent to what he had cut. He offered his land, 160 acres, for 160 acres of ours.”
Soon after the interview thus referred to, Hutchinson, who had heard that the Peter-mans had offered to give their land outright in compensation for the timber that had been cut, being in the neighborhood of their place, called to see them, and had a conversation with Charles and William Peter-man, whom he found at or near the mill which was being operated in the name (as the public at large understood) of Peterman Bros.' He asked whether they were willing to turn over their tract to the Poitevant & B’avre Co., by way of compromise, and they said, “No,” but that they were willing, to exchange their 160 acres for the company’s 160 acres. Hutchinson, being asked, “Who was the spokesman?” answered:
“Both; one talked as much as the other in the conversation. I can’t say which one. And I told them that the Poitevant & B’avre Company would not do that, notwithstanding that they had cut nearly all of the trees, and that it had more timber on it than the piece of section 9 that they had never cut. I told them all that I could say, while I hated to do it, was that I would be compelled to file suit, criminally and civilly, against them, and one of them spoke up and said: ‘Go ahead; I don’t give a damn; do what you please.’ ”
Charles Peterman says, in his testimony:
“He said that he was going to have me arrested for cutting on the land over there, and I told him, at the time, that he better be sure before he did anything, because I didn’t have a damned thing to do with it.”
William Peterman testifies as follows:
“Q. Was Charles present? A. Tes; he walked up a little after Mr. Hutchinson came, and he told Mr. Hutchinson that he didn’t have a damned thing to do with it, and didn’t care what he did. Q. Didn’t have a thing to do with what? A. Cutting the timber. Q. Did he tell him that he was not a partner in the sawmill business? A. No, sir.”
Bennett, a witness for plaintiff, who says that he was sitting in a buggy about 10 feet away, testifies, at one time, that:
“Charles Peterman told Mr. Hutchinson that he didn’t have a damned thing to do with the land; that he had better be particular what he was doing.”
At another time (on cross-examination), he testifies that:
“Charlie said he had better be particular what he was doing; that he didn’t have a damned thing to do with cutting the timber.”
He then says that he does not know whether Charles said that he had nothing to do with the land, or with the cutting of the timber.
The witness also testified that he did not hear Charles Peterman say anything to the effect that he was not a member of “Peter-man Bros.”- — he and William Peterman concurring on that point and flatly contradicting Charles.
The result of the interview being unsatisfactory to Hutchinson, he, in January, 1907, went to Covington and consulted Mr. B. M. Miller, the attorney of the company, and he also consulted the district attorney, and, upon the statement made by him, corroborated, in part, by the affidavits of two or three other persons, a civil suit was instituted to recover damages for the timber which had been cut, and a bill of information was filed against Charles and William Peterman, charging them with the offense of the cutting. About September 14, 1907, the defendant company, through Wm. J. Poite *713 vant, its vice president, applied to the Governor for a requisition for the parties, and, the district attorney of St. Tammany certifying that the case was a proper one, the requisition was issued on September 27th. On the same day it appears that Charles Peterman went to Covington — he says, in his testimony, on business in which defendants were not concerned, and in ignorance of the fact that any charge had been made against him, though he alleges in his petition that he went because he had heard of the filing of the information. However that may be, he was arrested; but, upon a verbal assurance of some sort by a citizen whom he knew, he was released. He says that he told the sheriff that he had to appear before the court in Hancock county, Miss., about the time that the district court in St. Tammany would hold its next term, and that the sheriff told him that he need not present himself before the court last mentioned. The sheriff admits that Peterman spoke of the necessity of appearing before the Mississippi court, but denies that he told him that he need not appear before the Louisiana court.
Thereafter the requisition mentioned was duly honored, and the two Petermans were arrested, in Mississippi, and taken to Covington, where Charles was detained in the parish prison for about four hours, when he was released on bond, and, later, the cases, civil and criminal, were tried, with the result that the company (defendant herein) obtained judgment for damages (for timber illegally cut on its land) against William Peterman, and he was convicted on the criminal charge and sentenced to pay a fine; the judgment being subsequently reversed by this court, on the ground that the act (No. 103, of- 1902) under which they were prosecuted was unconstitutional, the discharge of the accused being ordered without prejudice to any rights the state might have to prosecute under Act No. 137 of 1890. State v. Peterman, 121 La. 620, 46 South. 672. Charles Peterman escaped condemnation of the civil suit on the ground, as we understand, that he was not a member of the firm of Peterman Bros, and did not participate in the cutting of the timber, and the criminal proceeding was “nolle prossed,” and thereafter he brought his action in damages, charging that the defendant company and its vice president conspired together, maliciously, to oppress and injure him. The case was tried in the district court before a jury, which brought in a verdict for defendant, and, the judge having confirmed the finding, plaintiff has appealed.
Opinion.
The testimony shows that neither the vice president nor any one else interested, in the defendant company entertained any feeling of hostility or malice towards the plaintiff, and the results obtained in the civil suit instituted by the company and in the criminal prosecution are conclusive to the effect that the representatives of the company had legal justification for the course pursued by them, in so far as Peterman Bros, and whoever may properly be included in that title are concerned. The only question, then, is whether plaintiff did not, by his conduct, furnish probable cause for the belief, under which defendant and its representatives acted, that he was one of the Peterman Bros, whom they charged with being guilty, and whom the court found guilty, of depredating upon their timber. The jury and the judge, before whom the witnesses appeared, have answered that question in the affirmative, and after carefully considering the testimony, as we find it in the transcript, we are of opinion that the answer is correct. It may be that, in the opinion of the plaintiff, he was not a member of any such firm as Peterman Bros.; in fact, from the testi *715 mony of William Peterman, it would appear that, in his opinion, there is no such legal entity.
Thus he 'is interrogated and answers as follows:
“Q. Who composed the firm of Peterman Bros.? A. It was not any firm of Peterman Bros. My brother Jules and myself, we ran the mill machine for the Pelican Box Factory. Q. Was Charles Peterman a member or interested in the firm or concern known as Peter-man Bros.? A. No, sir.”
Those questions were asked by plaintiff’s counsel, of plaintiff’s witness and brother, from which, and from the general trend of the testimony, it is quite evident that there was a firm or concern doing business under the name of Peterman Bros., and it follows, as a legal proposition, that if those who were associated in that way were engaged in business, with a view of sharing the profits of the business, there was a partnership. William Peterman says that he and his brother Jules “ran the mill for the Pelican Box Factory”; but that does not explain the situation. He does not say that they were salaried employés, and it is pretty evident that they were not, because Hall and Wood, who were caught in the act of hauling away defendant’s timber, said that they were working for “Peterman Bros, and the almighty dollar,” and, if the timber which the Petermans cut from defendant’s land had been cut for the benefit of the box factory, the Petermans would hardly have felt called on to make the offer that they did in settlement of the matter. On the other hand, if their business consisted of buying and sawing timber, and selling it, and sharing the profits, the fact that the box factory was their only customer would not prevent the relation being one of partnership. So that William Peterman probably spoke in ignorance when he said, “It was not any firm of Peterman Bros.,” if he meant by that that he and his associate, or associates, in business did not, as a matter of law, occupy a relation towards each other which gave them the rights and imposed on them the obligations of partners. The cutting of the timber on section 10, which belonged to defendant, was sought to be excused on the ground that the Petermans thought that they were cutting on section 9. But section 9 did not belong to William and Jules Peterman. It belonged to William and Charles, and we feel bound to ask ourselves the question, upon what terms and conditions were William and Jules cutting and sawing and selling the timber of which Charles was a half owner? And we recall, in that connection, that Charles and William bought the S. E.% of section 9, with a view of starting a sawmill and of operating as partners, and that Charles stated, at the time, in substance, that the boundaries of the tract so purchased were unimportant— “the claim was all that he wanted.” Again, it seems to us a matter of some significance, upon the question of the actual relations between the parties, that Charles Peterman should have participated, as a party in interest, in the negotiation with Hutchinson with regard to the compromise of defendant’s claim. Why should he have discussed and acquiesced in the offer made by his brother, to exchange land, of which he was part owner, for defendant’s land, in order to effect such compromise, if he had no interest in the matter? The idea of the offer was to make good the loss which defendant had sustained, and plaintiff would, apparently, have the court believe that, after standing by and allowing his brothers to use his property as they pleased for the purposes of their own business, he was willing to go further and allow it to be used to compensate á loss sustained by defendant, for which he was not responsible, and from which he had derived no benefit. But, conceding, for the sake of the argument, that plaintiff really had no interest in the *717 affairs' of Peterman Bros., and had in no wise profited by their depredation on defendant’s land, the question still remains, Did he not, by his conduct, justify a contrary belief, and thereby himself furnish probable -cause for the action taken by them? We think he did. His name is Peterman. He is a brother of William Peterman. Hutchinson found the two together, at the place •of business of Peterman Bros.; and in the negotiations which then took place, concerning the claim which Hutchinson was asserting against Peterman Bros., the one of the brothers took as active a part as the other, and the pronoun “we” was used, certainly by William Peterman, without any comment from Charles.
Now it is true that Charles testified that:
“He [Hutchinson] said that he was going to have me arrested for cutting on the land over there, and I told him, at the time, that he better be sure before he did anything, because I ■didn’t have a damned thing to do with it.”
And in his petition he alleges that he was not present in the state of Louisiana at the time it is charged that said alleged offense was committed.
It would appear, therefore, that he was -or might have been, under the impression that he could have incurred no liability for the cutting of defendant’s timber, if he was not actually present when it was done, even though it was done at his instance and for his benefit, and his statement that he “didn’t have a damned thing to do with it,” conceding that he made it, might very well have been merely a conclusion of his, in which Hutchinson was not bound to concur; for, if plaintiff was a member of Peterman Bros., and the timber was cut by their authority and for their benefit, as has been shown and adjudged was the case, he had a great deal to do with it, whether he was present in the state of Louisiana or not.
It is also true that plaintiff testifies that he told Hutchinson that his brothers “Willie and Jules owned that mill,” and that he was not a partner of theirs; but Hutchinson testifies, most positively, that he said nothing of the kind, and William Peterman and Bennett are very positive that they heard nothing of the kind. To which testimony may be added the negative, but corroborative, fact testified to by defendant’s witnesses, that, if defendant had known that there was another person included in Peterman Bros., it would have proceeded against him, as it did against William and Charles Peter-man, of whom alone it had heard.
Our conclusion, then, is that, whether plaintiff was a member of the business concern known as Peterman Bros., or not, he so conducted himself as to justify defendant’s agent in believing that he was thereby furnishing probable cause for the action taken against him, and that he cannot now complain of that action. Clement v. Creditors, 37 La. Ann. 692.
“Probable cause does not depend upon the actual state of the case, in point of fact, but upon the honest and reasonable belief of the party prosecuting.” Sandoz v. Veazie, 106 La. 202, 30 South. 767.
' “An action for damages, on account of malicious prosecution, cannot be sustained, except on proof of malice and want of probable cause for the prosecution of which the plaintiff complains.” Laville v. Biguenaud, 15 La. Ann. 605.
The verdict and judgment appealed from are, accordingly,
Affirmed.