69 So.2d 567 (1953)
O'ROURKE
v.
O'ROURKE et al.
No. 20128.
Court of Appeal of Louisiana, Orleans.
November 30, 1953.
Rehearing Denied February 1, 1954.
Writ of Certiorari Granted March 22, 1954.
Writ of Certiorari Denied March 22, 1954.
*569 Kullman & Lang and Seme S. Klegar, New Orleans, for plaintiff-appellee.
Clarence E. Strauch, New Orleans, for Edward J. O'Rourke, defendant-appellant.
Prowell, Viosca & Reuter, New Orleans, for Dr. C. Grenes Cole, defendant-appellant.
Writ of Certiorari Granted (Anna L. O'Rourke) March 22, 1954.
Writ of Certiorari Denied (Edward J. O'Rourke) March 22, 1954.
JANVIER, Judge.
Plaintiff, Anna L. O'Rourke, seeks to recover solidary judgment against her brother, Edward J. O'Rourke, and Dr. C. Grenes Cole, former coroner of the Parish of Orleans, for damages alleged to have been sustained by her as the result of the issuance by the coroner at the instigation of O'Rourke of a "recommendation" for her commitment to the City Hospital for Mental Diseases. She prays for $25,000 which she itemizes as follows:

For false arrest and confinement, $ 5,000
For mental anguish and suffering, 5,000
For embarrassment, humiliation
 and injury to her reputation, 5,000
For exemplary damages for malicious
 false arrest and confinement, 10,000

From a solidary judgment in favor of plaintiff and against the two defendants for $7,500, which judgment was based on a jury verdict, both defendants have appealed, Dr. Cole devolutively and suspensively, and O'Rourke devolutively only.
When the matter was first submitted to us, La.App., 50 So.2d 832, 52 So.2d 606, we entertained, and still entertain, some slight doubt as to our jurisdiction ratione materiae. Among the items of damage set forth we find none which necessarily indicates that physical injuries were sustained.
While there has been no motion or suggestion by counsel that we dismiss the appeal or transfer it to the Supreme Court for lack of jurisdiction, we cannot overlook the fact that if we have no jurisdiction ratione materiae, jurisdiction cannot be conferred on us by consent or by failure of one of the parties to raise the question. Code of Practice, Art. 92; Reeves v. Barbe, 200 La. 1073, 1074, 9 So.2d 426; Farrell v. Orleans Parish Democratic Executive Committee, La.App., 15 So.2d 524. We therefore conclude that it must be first determined that we have jurisdiction ratione materiae before we can pass to the merit of the controversy.
In Eumont v. Railway Express Agency, Inc., La.App., 28 So.2d 526, 527, there was presented a claim of $23,000 based on the following items of alleged damage: Injury to reputation, loss of liberty, embarrassment and humiliation, mental suffering and strain, legal expenses and fees incurred. We called attention to section 10 of Article 7 of the Constitution of Louisiana under which it is provided that the Supreme Court shall have jurisdiction in all civil matters in which the amount in dispute exceeds $2,000, "except in suits for damages for physical injuries to, or for the death of a person, or for other damages sustained by such person or his heirs or legal representatives, arising out of the same circumstances * * *." We directed attention to the fact that, by Section 29 of the same article of the Constitution, the excepted cases are appealable to this Court. Referring to the items of damages claimed, we said:

*570 "* * * In none of the itemized claims are physical injuries involved, and it has been held many times that where damages in excess of $2,000.00 are sought for malicious prosecution, humiliation, mental anguish or the like, an appeal therein lies only to the Supreme Court. Clarke v. Bandelin, 6 La.App. 564; Liner v. Authement, La. App., 150 So. [71] 72; Duplantis v. Chauvin, La.App., 158 So. 653; Spearman v. Toye Bros. Auto & Taxicab Co., 164 La. 677, 114 So. 591. * * *"
We transferred the matter to the Supreme Court and that Court did not disagree with us, but decided the matter on its merits. Eumont v. Railway Express Agency, Inc., 213 La. 1040, 36 So.2d 30.
We think it quite unnecessary to say that the inclusion in the claim of an item of $10,000 for exemplary damages is in no sense a claim for physical injuries.
However, we do notice in the petition a statement that the damages, which are itemized and are set forth above, were sustained "in addition to suffering physically." We also notice in the petition an allegation that, since the occurrence complained of, plaintiff has been "mentally and physically upset," and that "she has suffered a setback in her recovery." We note also from her testimony that plaintiff claims that while she was in the City Hospital for Mental Diseases she was subjected to much discomfort, and we conclude from these allegations and from this testimony that the suit to some extent is based on physical suffering and consequently conclude, though not without some doubt, that we should allow the matter to remain here rather than transfer it to the Supreme Court.
If the claim is based to any extent on physical injuries, we have jurisdiction even though the major items included in the tort claim are for mental anguish, embarrassment, etc.
We have not overlooked the decision of our Supreme Court in Newsom v. Starns, 174 La. 955, 142 So. 138, in which it was held that the Court of Appeal for the First Circuit had no jurisdiction over that part of a claim which was based on alleged damages resulting from the publication of libelous matters, although the alleged libel had resulted from the publication of statements concerning the occurrences on which the suits for damages for physical injuries were based. Concerning the claims based on libel, the Supreme Court said that they "are not suits for damages for personal injuries, but are separate and distinct causes of action, over which the Court of Appeal has no jurisdiction, since the amount in dispute exceeds the sum of $2,000. Const. 1921, art. 7, § 10 and section 29."
The same cannot be said concerning claims for mental anguish, embarrassment, etc., resulting from acts which caused the physical injuries if there were physical injuries.
Our conclusion is that we have jurisdiction of the matter.
The record shows that on July 8, 1946, Edward J. O'Rourke, accompanied by his brother Frank, called on Dr. C. Grenes Cole, then the coroner of the Parish of Orleans and reported to Dr. Cole that "he thought she (his sister Anna) was a mental case"; that the "whole family thought that something ought to be done; that she should have an examination," and requested the coroner "to issue the necessary papers for that examination."
It also appears that O'Rourke, in the presence of his brother Frank, who has since died, told Dr. Cole many other things about his sister on which he based his belief that her mental condition should be examined into. Most of the information which Dr. Cole says he obtained from O'Rourke is also shown on the history taken at the City Hospital for Mental Diseases which is based on information given by Edward J. O'Rourke. We quote from the report of the City Hospital for Mental Diseases as to the information which it obtained from Edward O'Rourke:
"Mental disorder began two years ago. Lives with sister-in-law, beats up *571 the children unnecessarily. Goes around the neighborhood telling people her sister is married to a Negro mason, even wrote this to her sister. Tells everybody informant is a drunkard and owes grocery bill and grocer stopped giving him groceries. Went to District Attorney's office and made false charges against informant and other members of the family. Subpoenaed 3 brothers for July 17 at 2nd Recorders Court. Swindled brother John of $200.00. George, $400.00. Cashed six checks belonging to nephew which he signed and gave to patient supposedly to give to her brother. Stands in front of brother's (informant) and Sister's home and abuses them. Goes to neighbors and talks about brothers and sisters. No homicidal or suicidal threats or attempts.
"Personal History: Catholic, Born in N.O., here for life. Single, no children. 8th grade. No smoke, drinks once or twice a week and gets drunk, no dope. Works one day a week at Handelman's Store. Never in jail. Never in Mental Hospital. S.S. No.
"Family History: Father born in N. O., dead. (In C.H.M.D.) Mother born in N.O., dead. Seven brothers living, none dead. Two sisters living, none dead. Father, two brothers and one nephew were patients here."
As a result Dr. Cole issued and delivered to O'Rourke a document referred to as a commitment, which document was on a printed form, the blanks being filled in in ink. The pertinent parts of it read as follows:
 "Office of the Coroner
"No. 6338 New Orleans, La., July 8, 1946
 -----
 14919
"I Certify, that I have examined into the
mental condition of Anna L. O'Rourke Color
W age 53 sex F married S occupation
None residing 1017  4th St. and believing
her to be insane, I would recommend her
for observation examination not insane
Commitment to City Hospital
 Release from Parish Prison
"Request of Edward J. O'Rourke
Brother.
 "C. Grenes Cole D.M.
 Coroner, Ex-Officio City Physician
 Per Jos. S. Hogan."
The words "for observation" were encircled in ink. The words "examination not insane" in ink were stricken out, as were the words "released from parish prison". O'Rourke delivered this document to the Police Department of New Orleans, and, at about midnight on July 10th, the plaintiff, Anna L. O'Rourke, was taken from her residence by two police officers, accompanied by Edward J. O'Rourke, who took her to the City Hospital for Mental Diseases where she was kept until about noon on the following day when she was released to her sister-in-law, Mary Jane O'Rourke, who, in writing, agreed "to exercise proper care, protection and supervision over her." The release states that it was requested by Mary Jane O'Rourke and was granted "against advice of doctors." This suit has resulted.
Plaintiff bases her claim against her brother on the allegations that he acted with malice and without probable cause, and she bases her claim against Dr. Cole on the allegations that he violated the law of Louisiana in issuing the order for commitment without first requiring that she be personally examined by himself and by another qualified physician, and she also charges that Dr. Cole acted with malice and without probable cause.
Plaintiff also charges that even if the law of Louisiana in such a situation did not require that before issuing such a recommendation the coroner should have made a personal examination of the plaintiff, no such recommendation or commitment should ever be issued by a coroner without such a personal examination. Plaintiff contends that the only authority under which the coroner could have acted was Act 303 of *572 1944, which provides in section 12 as follows:
"* * * Upon the application of a near relative, or in the absence of relatives, a near friend, curator or other responsible citizen, accompanied by a certificate signed by the coroner and one other qualified physician, stating that a person is mentally ill, mentally defective, epileptic or inebriate, and is in need of observation or care in a mental hospital, the superintendent or chief officer of such hospital may receive such mental patient for such care and treatment as may be necessary."
In paragraph two of section 12 it is provided that:
"* * * The coroner and the other qualified physician who sign the accompanying certificate shall certify that * * * they have examined the patient within three days of the date of the application; that the patient is in need of observation for mental disease and hospital care. * * *"
Defendants have challenged in the Civil District Court for the Parish of Orleans the constitutionality of Act 303 of 1944, contending there and contending here that the act is unconstitutional and that consequently the statute which was in force and applicable when the occurrence complained of took place was Act 34 of 1926, and that as a result there is no liability, since, according to defendants, that statute does not require that the coroner shall examine the person for whom a commitment is sought prior to the issuance of the necessary certificate and that, under the Act of 1926, the coroner need only determine that it is in the public interest that the person involved be brought in for examination and that if, from the evidence before him, the coroner feels that such an examination should be made, he may issue the necessary certificate and require that the person be brought to the proper institution for examination. The pertinent portion of that statute, Act 34 of 1926, LSA-R.S. 33:1625, reads as follows:
"* * * that said Coroner shall have the power and right to examine in all cases of alleged insanity whenever in his opinion such examination is required by the public interest, * *."
Counsel for plaintiff asserts that Act 303 of 1944 is constitutional, but that even if it is not, and as a result Act 34 of 1926 is held to have been the controlling law on the subject at that time, still there is liability, since, according to counsel, even the act of 1926 does not authorize the coroner to take such action as was taken here without first making a personal examination of the person whose sanity is questioned.
We think it necessary that we first determine whether the statute of 1944 is constitutional because obviously if it is, then as a result thereof certain steps should have been taken by the coroner before he could recommend that Anna O'Rourke be taken to an institution for commitment or even for observation. Among those steps and probably the most important of them is the requirement that both the coroner and some other qualified physician should certify that they had examined the patient within three days of the issuance of the recommendation.
The contention that the statute of 1944 is unconstitutional is based on the fact that it contains no enacting clause. The State Constitution of 1921, in section 7 of Article 3, provides that:
"The style of the laws of this State shall be: `Be it enacted by the Legislature of Louisiana.'"
A mere glance at an official volume of the acts of 1944 discloses that the statute in question, Act 303 of 1944, contains no such clause nor any part thereof. Counsel for plaintiff asserts that this is unimportant and that our Supreme Court has so held, stating that the requirement as to "the style of the laws of this State" is merely directory and not mandatory, and that consequently the omission of such a clause does not render a statute unconstitutional.
The decision relied on by plaintiff is City of Shreveport v. Dale, 149 La. 439, 89 So. *573 408. In that case in a syllabus written by the editorial staff of the publishing company and not by the Court itself, it is stated that such a constitutional provision is merely directory, "since the omitted words can be readily supplied by the attending circumstances." At that time the constitutional requirementquite similar to that in the Constitution of 1921, was found in Article 22 of the Constitution of 1898. It provided as follows:
"The style of the laws of this State shall be: `Be it enacted by the General Assembly of the State of Louisiana'".
The enacting clause of the statute which was under attack in the Dale case was defective in that although the words "Be it enacted * * *" were contained in the clause, they were not followed by the words "by the General Assembly of the State of Louisiana".
We direct special attention to the fact that some part of the enacting clause was contained in the act and to the further fact that the act under attack, Act 25 of 1920, was a "re-enactment" of a section of an earlier statute, section 10 of Act 158 of 1898, and that that earlier statute contained a full enacting clause in accordance with the constitutional requirement.
It is true that the Supreme Court did say that, in State v. Harris, 47 La.Ann. 386, 17 So. 129, it had clearly indicated its opinion that the "constitutional provision is merely directory." However, an examination of the opinion of the Supreme Court in State v. Harris, supra, convinces us that the Court did not express the view that the omission of the entire clause would not have had the effect of vitiating such a statute. On the contrary, a reading of that decision leaves us with the firm conviction that the Court held the opinion that, should the entire enacting clause be omitted from a statute, unconstitutionality would result. In the Harris case there was present an enacting clause, which was defective in that there were omitted therefrom the words "of the State of Louisiana," the clause merely reading: "Be it enacted by the general assembly." The Court, after referring to the fact that in another State in the Constitution of which there was a provision "similar to our own" it had been held that the omission of the entire enacting clause would vitiate the statute, expressly directed attention to the fact that in the case before it, the Harris case, "the omission is only of the words `of the state of Louisiana'" and the Court then said:
"There remains the substance of the enacting words required by the constitution."
At this point we find it interesting to note that Sutherland, in his work on Statutory Construction, Third Edition, Vol. 1, sec. 1803, page 321, says:
"* * * Apparently most courts hold the provision `mandatory' when there is a complete absence of an enacting clause, but `directory' when an imperfect enacting clause exists."
The author quotes a very pertinent statement from Louisville Trust Co. v. Morgan, 180 Ky. 609, 203 S.W. 555, 558, 7 A.L.R. 396, in which the Supreme Court of Kentucky said:
"* * * there is a marked difference between the failure to provide an act with an enacting clause and the failure to provide the act with a perfect enacting clause."
In Commonwealth v. Illinois Cent. R. Co., 160 Ky. 745, 170 S.W. 171, L.R.A.1915B, 1060, there was presented the identical situation which is involved here. The Constitution of Kentucky provided that:
"The style of the laws of this commonwealth shall be as follows: `Be it enacted by the General Assembly of the commonwealth of Kentucky.'" Const. Ky. § 62.
The statute which was under attack in that case did not contain this enacting clause. The Court cited many decisions on the subject, and held that the total absence of an enacting clause renders such a statute unconstitutional.
*574 To revert to the decision of the Supreme Court in City of Shreveport v. Dale, supra, we note that the Court cited State v. Cucullu, 110 La. 1087, 35 So. 300, 301. In that case there was found the identical question which had been presented earlier in State v. John Harris, supra. The statute in question contained a defective enacting clause in which the words "of the state of Louisiana," were omitted, the clause merely reading "Be it enacted by the General Assembly that * * *." The Court said:
"When we find among the published statutes of the state an act reciting that it was enacted by the General Assembly, authenticated as this act is, we cannot possibly reach any other conclusion than that the General Assembly referred to is that of the state of Louisiana. Adams v. Lewis, 7 Mart. (N. S.) [400] 402; Lallande v. Terrill, 12 La. 7."
In the statute which is under attack before us we do not find even the words "Be it enacted."
In State v. Fore, 131 La. 813, 60 So. 255, 256, there was an enacting clause which was attacked because the words "section first" were not placed at the beginning of the clause but after the words "General Assembly." The Court said:
"* * * The act is not made unconstitutional by this slight change of placing the words `section first' as they are."
In Bethlehem Supply Co. v. Pan-Southern Petroleum Corporation, 207 La. 149, 20 So.2d 737. 740. a statute was under attack on the ground that it did not contain an enacting clause. Act 145 of 1934, as originally enacted, contained a full and complete enacting clause, reading as follows:
"Section 1. Be it enacted by the Legislature of Louisiana, * * *."
In 1940 the Legislature passed Act 100, the first section of which reads as follows:
"Be it enacted by the Legislature of Louisiana, That Act 145 of 1934 is hereby amended and re-enacted so as to read as follows: * * *."
There was no repetition of the enacting clause which had originally appeared in the act of 1934. It was contended that the Statute which was being re-enacted should, in the re-enactment, contain an enacting clause. The Supreme Court said that the enacting clause which was contained in the Act of 1940 was sufficient; in other words, that a statute which amends and re-enacts an earlier statute complies with the requirement that there must be an enacting clause if it itself contains the clause, even if the statute which is being re-enacted does not in the re-enactment contain such a clause.
At the trial below, when the question of the constitutionality of the statute of 1944 was being considered, counsel for plaintiff mentioned the Journal and the Calendar of the House for the year 1944, and also mentioned the Journal and the Calendar of the Senate for 1944. This was done apparently in the hope that it might be discovered that, as the act was actually passed, it contained the necessary enacting clause, and that, as a result, it might be determined that the omission of the words in the printed statute resulted from error in the office of the printer.
In Bethlehem Supply Co. v. Pan-Southern Petroleum Corporation, supra, appears the following:
"The official Journals of the House and Senate, when published and preserved, constitute the ultimate proof of verity of the proceedings. No extrinsic proof is admissible for the purpose of contradicting the facts therein recited. * * *
"`It is well settled that the Journal of the proceedings of each House is a public record, of which the courts are at liberty to take judicial notice.' State ex rel. Porterie, Attorney General v. Smith, 184 La. 263, 166 So. 72, 77, and authorities therein cited. See also State v. Bauman, 148 La. 743, 87 So. 732."
*575 However, an examination of those documents does not disclose whether the enacting clause was present when the act was introduced or when it was passed, and from the fact that it does not appear in the printed volume of acts, we conclude that the act was originally and finally defective, and that, as it was passed, it did not contain the necessary enacting clause. We further conclude that, as a result, the statute was unconstitutional.
In reaching the conclusion that the statute of 1944 is unconstitutional because of the total absence of any portion of an enacting clause, we have not overlooked the fact that in the matter of In re Bryant, 214 La. 573, 38 So.2d 245, 249, our Supreme Court was called upon to consider and discuss several sections of that statute, Act 303 of 1944, and finally based its "decision solely on the provisions of Act No. 303 of 1944 under which plaintiff was committed." This is the same statute which we now have the temerity to declare unconstitutional.
Since we hold the statute of 1944 to to be unconstitutional, it necessarily results that, in our opinion, the actions of the coroner were controlled by Act 34 of 1926, as contended for by counsel for the coroner, and we think it clear that Act 34 of 1926 did not expressly require that the coroner should examine the person whose commitment was sought, but merely required that he should have the right "to examine in all cases of alleged insanity". "To examine in all cases" meant that he should obtain such information as he might think necessary to determine whether the mental condition of the person whose commitment was sought was such as to warrant his recommending that such person be brought to the proper place for personal examination. That it was not contemplated by that statute that the coroner must initially personally examine the person whose commitment was sought is made more evident by the wording of that part of the statute which provides that, upon an order from a district judge, it shall be the duty of the coroner "to examine into the sanity of such person or persons".
We direct attention to the fact that the coroner is not expressly required to examine such person or persons, but is required "to examine into the sanity * * *." Surely this means that he shall obtain such information as would be sufficient to form the basis of an opinion as to the sanity of the person. Of course, an examination into the sanity of the person might include a personal examination of the person, but we think that, under that statute, obviously a coroner might, in good faith, send for the person for examination without first having made the personal examination.
Since it was not expressly made the duty of the coroner to examine the person of the plaintiff before ordering her brought to the City Hospital for Mental Diseases, we think that he should not be liable for his actions in sending for her, if it is made to appear that he acted in good faith and on evidence which would have induced any reasonably prudent person acting in the same capacity to take the action which he took. And we say this because an exhaustive study of much authority on the subject and of several judicial decisions of our Supreme Court and of other courts leads us to the conclusion that a public official, acting in a quasi judicial capacity or in a capacity which permits the exercise of discretion, is not civilly liable in damages for the results of his official acts, if the actions are taken in good faith and without malice and the evidence is such as would have induced any other person similarly situated to take similar action.
In the first place, it seems clear that, under Act 34 of 1926, there is no ministerial duty in the coroner either to act or to refuse to act in such situation as confronted Dr. Cole when he was requested by the brother of the plaintiff to send for her for examination. It was a matter in which he had the right to examine if he thought such examination necessary or in which he had discretion to act if he thought that the information which he had justified action.
In McQuillin's Municipal Corporation, Second Edition, Vol. 2, par. 556, p. 280, appears the following statement:

*576 "Under a variety of circumstances the general principal has been often asserted that where a public officer is, by law, vested with discretionary ministerial powers, and acts within the scope of his authority, he is not liable in damages for an error in judgment, unless guilty of corruption or wilful violation of the law. * * *"
In "A Treatise on Civil Liability" by Fowler Vincent Harper, Professor of Law in Indiana University, reference is made to the almost absolute immunity of the judges of our courts, and then, on page 668, in section 298, appears the following:
"* * * All other officials act within the protection of a conditional privilege only, and if they act outside their strict authority or solely from malice or for a purpose inconsistent and foreign to the purposes and policy of the legal privilege of their office, they render themselves liable to a civil action for damages to persons harmed by such improper conduct. This rule applies to a great number of lower executives and to administrative officers exercising what are frequently called `quasijudicial' powers. If the officer acts bona fide and honestly within the general range of his duties, he is not liable for an error in judgment or for a mistake innocently made. * * *"
In Vol. 18, C.J.S., Coroners, § 29, p. 309, it is said that:
"* * * Where a coroner is regarded as acting in an executive or ministerial capacity, he is answerable to those who are injured by any excess or abuse of his official powers; * *."
In Vol. 67, C.J.S., Officers, § 127, pages 420-421, appears the following statement:
"The general rule protecting judges from civil liability for acts within the limits of their jurisdiction, as discussed in Judges § 63, applies to officers exercising quasi-judicial powers whose discharge involves the exercise of judgment and discretion, exempting them, when acting within the scope of their authority or general jurisdiction, from liability for error or mistake of judgment in the exercise thereof or, according to other decisions on the question, negligence in its exercise, in the absence of fraud or of corrupt or malicious motives, or if acting bona fide. * * *"
It is also said, 67 C.J.S., Officers, § 127, on pages 421-422, to be
"* * * the better rule supported by the weight of authority, that, if the officer whose acts are complained of keeps within his powers, his motives, however corrupt and malicious they may be, may not be made a reason for holding him liable for the damages caused by his acts. * * *"
In American Jurisprudence, Vol. 42, Public Administrative Law, sec. 257, pp. XXX-XXX-XXX, appears the following:
"* * * The general rule is stated that an administrative officer is not personally liable in a civil action for damages for his error or mistake in making a determination, where he was acting within his jurisdiction, in the honest exercise of his judgment, without bad faith, malice, or corrupt motives, in a judicial or quasi-judicial capacity, or in a capacity which was not merely ministerial but one in which it was his duty to exercise judgment and discretion. * * *"
On page 707 of the same section, footnote No. 13, appears the following:
"Although the officer may not, in strictness, be a judge, still, if his powers are discretionary, to be exerted or withheld, according to his own view of what is necessary and proper, they are in their nature judicial, and he is exempt from all responsibility by action for the motives which influence him, and the manner in which such duties are performed. Wilson v. Mayor etc., of City of New York, 1 Denio (N.Y.) 595, 43 Am.Dec. 719."
*577 Again, in the same volume, 42 Am.Jur., on page 704, is the following statement:
"* * * it is said that where public officials are acting within the scope of their duties and exercising a discretionary power, the courts are not warranted in interfering unless fraud or corruption is shown, or the power of discretion is being manifestly abused to the oppression of the citizen. * * *"
In American Jurisprudence, Vol. 43, Public Officers, sec. 274, p. 89, we find the following:
"Where an officer is invested with discretion and is empowered to exercise his judgment in matters brought before him, he is sometimes called a quasi-judicial officer, and when so acting he is usually given immunity from liability to persons who may be injured as the result of an erroneous or mistaken decision, however erroneous his judgment may be, provided the acts complained of are done within the scope of the officer's authority, and without wilfulness, malice, or corruption."
In Lecourt v. Gaster, 50 La.Ann. 521, 23 So. 463, our Supreme Court discussed the possible civil liability of an officer acting in good faith and made the following statement:
"The officer owes a responsibility to the public. He is presumed, in the discharge of his functions, to have acted in accordance with law, until the contrary is made evident. To sustain an action in damages against an officer, it must be shown that he grossly abused his authority.
"It has been decided, as to him, a mistake such as a person of ordinary care and intelligence might make will not amount to an actionable abuse. Under this obligation, it was defendant's duty to look to the enforcement of the law. The right of action against an officer is limited. It must be shown that the officer did negligently that which it was his duty to do, or that he willfully and maliciously perpetrated an injustice."
Then followed a statement which we consider pertinent:
"In any case, it must, in our view, clearly appear that he was not acting within the scope of his authority owing to a determination on his part to impose upon private right. * * *"
In Sandoz v. Veazie, 106 La. 202, 30 So. 767, is found an interesting discussion on the question of the liability or nonliability of an official who, in the discharge of his duties, acts without malice.
A review of these and other authorities convinces us that the public interest demands that an officer, such as a coroner, should not be held liable for such action as Dr. Cole took, unless it be made to appear that the officer's actions are not such as would have been taken by any other reasonably prudent official acting on the same information.
We realize, of course, that from such situation there is created a dilemma in that, on the one hand, the public interest demands that the public official be protected against liability where he acts in good faith and on what would seem to be sufficient information, whereas, on the other hand, the public interest also demands that no individual should, without just cause, or without reasonable evidence, be subjected to the embarrassment and humiliation of being brought to a mental institution even if only for observation.
Our Supreme Court recognized the fact that, in such a situation, there are involved the rights of the public official and also those of the individual when, in the matter of In re Bryant, supra [214 La. 573, 38 So. 2d 249], it said that even a commitment "produces none of the effects of a formal interdiction", and that such statutes as those which we have discussed are enacted "to protect both the patient and the general public".
Thus, believing as we do, that in such case the public official should not be held *578 liable in damages if it is made to appear that he acted in good faith, without malice, and with probable cause, and that his acts were such as would have been taken by any other reasonably prudent official similarly situated and having similar information before him, we find it necessary to investigate the evidence which was before the coroner when he took the action which resulted in this litigation.
And, first, we think that we should comment on the fact that the coroner was not permitted to introduce evidence which was tendered in an effort to show that, in the first place, the custom in that office, not only during his many years of tenure, but also in the term of his predecessor, had been to do just what he did in this case, and to comment on the further fact that he was not permitted to introduce evidence which was tendered for the purpose of showing that the Attorney General of Louisiana had rendered an opinion to the effect that the Act of 1944 was unconstitutional, and that the procedure which he followed in this instance was authorized by the applicable statute, Act 34 of 1926.
If the question of good faith is involved, and we think that it is, then obviously evidence of the kind tendered would have had an important bearing on a determination of that question.
In the third syllabus in Sandoz v. Veazie, supra, appears the following:
"Where a party has communicated to his counsel all the facts bearing on the case of which he has knowledge, or could have ascertained by reasonable diligence and inquiry, and has acted upon the advice received honestly and in good faith, the absence of malice is established, the want of probable cause is negatived, and the action for malicious prosecution will not lie * * *."
While the excluded evidence as to the custom in the office of the coroner is not before us, it seems quite apparent from a reading of our decision in Dauphine v. Herbert, La.App., 37 So.2d 829, that all that was there required for the issuance of an order of commitment was that the relatives of the person whose commitment was sought should sign the commitment book. In other words, it seems to have been the custom in the office of the coroner that, where responsible persons, particularly relatives, report what they think is a case of insanity and are willing to "sign the book," the coroner issues the necessary recommendation that the person be brought in for examination.
We cannot overlook the very important fact that the coroner was visited by two brothers of the plaintiff. He had not the slightest reason to suspect that they were prompted by animosity or malice. One of these brothers, the defendant Edward J. O'Rourke, in the presence of the other, gave the coroner the information on which he based his recommendation that the plaintiff be brought in for observation, and if the statements which that defendant made to the coroner were true, there would have been no doubt that the plaintiff should have been placed under observation.
Furthermore, the record shows that Edward J. O'Rourke, in addition to the statements which he made to the coroner about his sister, said that in addition to himself and his brother, all of the members of the family wanted her brought in for investigation. It seems that the same statements were made to those who took the history of the sister at the Hospital for Mental Diseases. And we find it difficult to ignore the fact that when a preliminary or partial examination of the plaintiff was actually made on the following day, the doctorsand there were two other mental experts in addition to the coronerreached the conclusion that plaintiff was suffering from an "undifferentiated psychosis" which the doctors explained, in lay language, meant that she was suffering from a mental condition; in other words that she was not entirely sane. One of them when pressed stated that it meant that she "looked crazy".
In Barfield v. Marron, 222 La. 210, 62 So.2d 276, 280, our Supreme Court discussed a case in which there was involved a charge of malice or action in bad faith and *579 called attention to the necessity for protection of those who, in good faith, honestly seek to enforce the law and administer justice and who act on information which would have been sufficient to persuade the reasonably cautious man to believe action necessary. The Court said:
"It has been well said in Lyons v. Carroll, 107 La. 471, 31 So. 760, 761, that `Those who honestly seek enforcement of law and the administration of justice, and who are supported by circumstances sufficiently strong to warrant a cautious man in the belief that the party suspected may be guilty of the offense charged, should not be unduly apprehensive that they will be held answerable in damages.' * * *"
In O'Malley v. Whitaker, 118 La. 906, 43 So. 545, 546, the Supreme Court considered the question of the necessity for holding that a public officer who acts in good faith and on proper information should not be held liable. The Court said:
"If those in charge of the police cannot act upon information received unless it first appears that the information was known in some way by the one against whom it is brought, then it would be very seldom possible to act upon information received in causing an arrest."
See, also, Johnson v. Hodges, La.App., 65 So.2d 812.
We realize, of course, that the situation in which the charge is made against a police officer for false arrest is not identical with that which is present in the case at bar, but we think that the necessity for the protection of such an officer as a coroner who acts in good faith and in what he believes to be the interest of the public is also important and that such officer should be protected in such circumstances.
The plaintiff herself said that she had no reason to believe that Dr. Cole had any animosity towards her or that he acted with malice and we conclude from all of the facts shown in the record that Dr. Cole acted without malice, with probable cause, and that his actions were such as would have been taken by any other reasonably prudent official acting in his capacity and on the same information. And from this we conclude that he is not liable civilly from the unfortunate results of the issuance of his recommendation that the plaintiff be brought in for observation.
We cannot say the same of the other defendant, Edward J. O'Rourke, the brother of the plaintiff. As a matter of fact, on the witness stand, apparently in an effort to protect himself against civil liability, he denied having made to Dr. Cole and to the other officials at the Mental Hospital many of the statements which he obviously did make on both occasions.
It appears from the record that for many years this defendant and his sister, the plaintiff, had been very hostile towards each other, but the record convinces us that only to a slight extent was the plaintiff responsible. Most of the difficulties in which Edward J. O'Rourke found himself were of his own making and apparently his sister did nothing more than to attempt to help him straighten out his difficulties, though on several occasions she made charges against him and on one occasion had him placed under a peace bond. We think it charitable not to discuss in detail the actions of Edward J. O'Rourke, but merely to state that we reach the conclusion that in this situation he acted with malice and without probable cause. The necessary consequence is that he is responsible for such damage as his sister sustained.
However, we believe that the amount awarded by the jury is obviously excessive.
In Sandoz v. Veazie, supra [106 La. 202, 30 So. 773], appears the following:
"We also appreciate the fact that the plaintiff was acquitted by the petit jury of the charge brought against him, but that is apart from the present question, which is, not whether he was guilty, but whether the defendant had probable cause for believing, or suspecting, that he was guilty. We appreciate, *580 too, the further fact that the plaintiff obtained a verdict for $3,000 in this case; but here also the jury was called upon, as was the grand jury, to deal with a mixed question of law and fact, and may have confused the question of probable cause with the question of guilt or innocence, and may have assumed that a failure to find a verdict in plaintiff's favor would detract from his vindication, or would imply that he had not been entirely cleared of the original charge. Such errors are not uncommon, as may be seen from the following among many cases, in which similar verdicts have been set aside: Grant v. Deuel, 3 Rob. 17; Gerber v. Viosca, 8 Rob. 150; Gould v. Gardner [Sager & Co.], 8 La.Ann. [11] 12; Talbert v. Stone, 10 La.Ann. 537; Gould v. Gardner, 11 La.Ann. 289; Barton v. Kavanaugh, 12 La.Ann. 332; Osborn v. Moore, 112 La.Ann. 714; Pellenz v. Bullerdieck, 13 La.Ann. 274; Blass v. Gregor [& Wilson], 15 La.Ann. 421; Murphy v. Redler, 16 La.Ann. 1; Robertson v. Spring, 16 La.Ann. 252; Hopkins v. Garthwaite [Lewis & Miller], 28 La. Ann. 325; Dearmond v. St. Amant, 40 La.Ann. 374, 4 So. 72; Sibley v. Lay, 44 La.Ann. 936, 11 So. 581."
As we have already stated, it is almost unnecessary to state that no award can be made for exemplary damages for which $10,000 is claimed. It is well settled that no such allowance can be made in Louisiana. Spearman v. Toye Bros. Auto & Taxicab Co., 164 La. 677, 114 So. 591; Universal C. I. T. Credit Corp. v. Jones, La.App., 47 So.2d 359.
Plaintiff was subjected to embarrassment and humiliation, though we think that no real physical suffering was sustained except that she was strapped or tied to the bed on which she remained overnight, and that her head was somewhat lower than her feet. She was released at about noon on the following day so that she was deprived of her freedom for only about twelve hours.
In Dauphine v. Herbert, supra, a woman was kept in the same institution for five days, and yet she claimed only $285 as damages, which was the amount ultimately allowed her.
In Burton v. Llano Del Rio Co. of Nevada, 177 La. 366, 148 So. 259, plaintiff claimed damages as a result of "false arrest and imprisonment based on alleged insanity". The Supreme Court, stating that "the record disclosed not one scintilla of evidence of insanity", but that it did "disclose a plausible motive on the part of defendant * * * as the means of ridding himself of plaintiff's company and opposition * * *," approved an award of $250.
In Trahan v. Breaux, 212 La. 459, 32 So.2d 845, 846, in which a claim for $10,000 damages was made as the result of an alleged false imprisonment, the Supreme Court transferred the case to the Court of Appeal for the First Circuit, on the ground that obviously the amount to which the plaintiff might be entitled, if successful, would be less than $2,000, saying:
"With respect to the claim of $5,000 for plaintiff's mental anguish, embarrassment and humiliation, it is manifest that he would not be entitled to more than nominal damages for the alleged technical legal invasion of his rights. There is no charge of undue physical violence by the officers or any allegation of special damage resulting from the tortious act. In the absence of such allegations, an award of more than a nominal amount would be improper."
There is really no charge of undue physical violence by the officers who took plaintiff from her home to the hospital for mental diseases, and the evidence as to any improper roughness or abuse in the City Hospital for Mental Diseases is very slight.
Under all the circumstances we think the ends of justice will adequately be served by the allowance to plaintiff of the sum of $1,000.
*581 Accordingly, the judgment appealed from, insofar as it runs against defendant, C. Grenes Cole, is annulled, avoided and reversed and plaintiff's suit as to him is dismissed at her cost. Insofar as the judgment runs against defendant, Edward J. O'Rourke, the amount thereof is reduced to the sum of $1,000; in all other respects the judgment appealed from is affirmed, plaintiff to pay costs of appeal, all other costs to be paid by defendant, Edward J. O'Rourke.
Reversed in part; amended in part; affirmed in part.
REGAN, Judge (dissenting in part).
I respectfully dissent from that part of the judgment dismissing plaintiff's suit against Dr. Cole.
Christopher Marlowe once very poignantly observed "I am armed with more than complete steelthe justice of my quarrel." This observation is especially applicable to this dissent since it is predicated on the indisputable fact that the final cause of law is the welfare of society. I am convinced that the court's opinion has failed to give this fundamental concept of the law its full weight. In contra distinction it is predicated upon the hypothesis that a "public officer's freedom from liability", even though he utterly disregarded the existing law then applicable to the office of coroner, is a more important consideration than the welfare of society in the structure of our social order.
Chronologically, this case was initially considered by us on appeal from a judgment of the Civil District Court, which maintained Dr. Cole's exception of no cause or right of action. An analysis by us of plaintiff's petition disclosed that it did manifest a cause and a right of action, thus it was remanded for trial on its merits in conformity with the views therein expressed by us. O'Rourke v. O'Rourke, La. App., 1951, 50 So.2d 832. A rehearing requested by Dr. Cole, in which, he contended for the first time, the unconstitutionality of Act 303 of 1944 was denied. O'Rourke v. O'Rourke, La.App., 1951, 52 So.2d 606. That was Dr. Cole's second unsuccessful effort to exculpate himself from liability by virtue of pleading a sheer technicality. The case was finally tried before a jury and a solidary judgment was rendered in favor of plaintiff and against both defendants, Dr. C. Grenes Cole and Edward J. O'Rourke, for $7,500.
From that judgment both defendants have appealed. No one has ever expressed the slightest doubt about the liability of defendant, O'Rourkebut what about Dr. Coledoes he endeavor to principally defend himself, as a doctor of medicine or as any other man or woman who enjoys the prerogatives and privileges of a profession such as coroner should, on the ground that his actions, insofar as this plaintiff is concerned were legally and morally above reproach? No, he initially endeavored to seek refuge under the cloak of a public officer, and his principal defense is again based on a most technical observationa plea that Act 303 of 1944 is unconstitutional because the legislature, in enacting this statute, simply omitted the words "Be it enacted by the Legislature of Louisiana." The opinion of the court concedes that if the statute is constitutional, then Dr. Cole is liable to plaintiff, because this statute explicitly states that both the coroner and one other qualified physician should certify that they have examined the patient within three days of the issuance of the recommendation for commitment, and, in committing plaintiff, Dr. Cole acted in utter disregard of this act. However, the court pronounced the statute unconstitutional and concluded that "the actions of the coroner were controlled by Act 34 of 1926". The pertinent portion thereof reads as follows: "* * * that said Coroner shall have the power and right to examine in all cases of alleged insanity whenever in his opinion such examination is required by the public interest * * *." The opinion of the court then continues its rationalization "* * * the coroner is not expressly required to examine such person or persons, but is required `to examine into the sanity * * *.' Surely this means that he shall obtain such information as would be sufficient *582 to form the basis of an opinion as to the sanity of the person. Of course, an examination into the sanity of the person might include a personal examination of the person * * *." In my opinion this conclusion of the Court leads to a dangerous social precedentit ignores the welfare of society as a whole, particularly the rights of this relatively helpless plaintiff, to protect a public officer who disregarded the law pertaining to his office of coroner. The opinion of the court, in so many words, says that the statute permitted Dr. Cole to perform the psychiatrical miracle of interrogating Edward O'Rourke and thus determine the sanity or insanity of Anna O'Rourke, the plaintiff herein. The words of the statute, Act 34 of 1926, interpreted in their ordinary and literal sense have a plain meaning and that is that the Coroner has both the power and the right to examine the person alleged to be insane before (assuming that the act authorizes the commitment and I express doubt thereof) committing that person to the City Hospital for the mentally diseased. He chose to arbitrarily commit her without a personal examination and thus exposed himself to liability. When words appearing in a statute have a plain meaning in their literal sense, courts should be very cautious in permitting their imagination to give them a different interpretation.
In any event, the court, in summarizing, said that since it was not expressly made the duty of the coroner to examine the person of the plaintiff before ordering her committed to the City Hospital for the mentally diseased, the coroner should not be liable for having committed her "if it is made to appear that he acted in good faith and on evidence which would have induced any reasonably prudent person acting in the same capacity to take the action which he took."
In view of the foregoing statement by the courtan examination of the record is necessary to determine if Dr. Cole acted either or both, "in good faith" or on evidence which would have induced a typical prudent doctor to act as he did.
Dr. Cole asserted that on July 8, 1946, he was visited by two brothers of the plaintiff, Edward J. O'Rourke, a defendant herein, and Frank (now deceased), and that Edward O'Rourke stated to him that he thought his sister Anna was a mental case. Most of the information which Dr. Cole said he obtained from Edward O'Rourke, on this occasion, and on which he predicated his commitment of plaintiff to the City Hospital for the mentally diseased (although O'Rourke now denies that he gave Dr. Cole this information), is set forth at length on page six [69 So.2d 570] of the majority opinion, however, a quotation therefrom will serve the immediate purpose: "* * * Tells everybody informant (O'Rourke) is a drunkard and owes grocery bill and grocer stopped giving him groceries. Went to District Attorney's Office and made false charges against informant and other members of the family. Subpoenaed 3 brothers for July 17 (1946) at 2nd Recorder's Court * * *." In my opinion the foregoing statement reeked with self-interest and prejudice as it emanated from the mouth of Edward O'Rourke and into the ears of Dr. Cole, who admitted that he did not know the plaintiff, and a reasonably prudent man, more so a doctor of medicine, should have instantly reacted thereto with the impression that this was a family fight and, therefore, the exercise of the simplest kind of caution was indicated. Now, just what should this very simple caution have consisted of, Dr. Cole merely should have insisted upon some verification of O'Rourke's statement or more properly and professionally upon a personal examination of plaintiff's sanity, in conformity with the existing lawAct 303 of 1944before committing her to a mental institution. The most charitable conclusion that could be drawn from the actions of Dr. Cole is that he was guilty of gross error of judgment in ignoring the law under which the office of coroner operated, and arbitrarily abusing his discretion, but error, especially when it is gross, is not inconsistent with fault. This is too well settled to need citation in support thereof. The standard of diligence or care exacted under these existing circumstances was that of *583 a typical prudent doctor of medicine or coroner. The individual physician or coroner must answer for the unfortunate consequences when he falls beneath that norm. The finding of the "norm" was a question of fact for the jury, and they found as a fact that Dr. Cole's actions were below the norm of a typical prudent coroner.
An analysis of the record, in my opinion, also reveals that Dr. Cole manifested, in writing, "bad faith." In consequence of O'Rourke's statement to Dr. Colehe issued and delivered to O'Rourke a commitment, which he executed through the medium of two uniformed policemen at midnight, the pertinent part of which reads as follows: "I certify that I have examined into the mental condition of Anna L. O'Rourke * * * and believing her to be insane, I would recommend her for observation * * * commitment to the City Hospital." This certificate certainly cannot be interpreted to mean that by interrogating O'Rourke, Dr. Cole was thus able to determine the insanity of plaintiff. Can any other reasonable interpretation be placed on the foregoing words but that Dr. Cole, after personally examining plaintiff, believed her to be insane and recommended her commitment to the City Hospital for the mentally diseased? Does such a pronouncement of plaintiff's insanity, and subsequent incarceration in a mental institution, without ever having seen, spoken to, or examined her, although he wrote that he had, indicate a manifestation of "good faith", or the standard of diligence or care exacted under these circumstances of a typical prudent coroner? I think not.
I take no issue with the innumerable authorities relative to the liability of a public officer cited in the majority opinion, my only objection thereto is that it endeavors to put the law into a strait jacket by subjecting it to a pronouncement of unnecessary academic generality whereas we are concerned with a specific set of facts which are per se determinative of Dr. Cole's liability to the plaintiff.
The reasoning of the court's opinion is vitiated because it appears from the context thereof that it started with a prepossession and has endeavored to find arguments to sustain it. To illustrate, the court said, "We find it difficult to ignore the fact that when a preliminary or partial examination of the plaintiff was actually made on the following day, * * * two other mental experts in addition to the coroner reached the conclusion that plaintiff was suffering from an `undifferentiated psychosis' which the doctors explained * * meant that she was suffering from a mental condition". The record, in my opinion, reveals that was the weakest and most evasive sort of expert psychiatrical testimony, diagnosis, "undifferentiated psychosis", which simply meant that they did not have sufficient time to make an examination so as to intelligently arrive at a diagnosis and under these conditions have condemned plaintiff with the stigma of a "psychosis" in their effort to relieve Dr. Cole of liability to the plaintiff. However, it is interesting to observe that plaintiff was released following the alleged examination in the City Hospital. Would she have been released, in any event, if insane? It was obviously the type of expert testimony that this court has discounted in several relatively recent cases. Are we to draw the judicial veil so tightly around us,that we shall fail to place this corroborating expert testimony in its proper category and give it only the weight that its defensive source and environmental characteristics entitled it to. In this instance, Dr. Cole had exposed himself to liability and no one knew it better than the alleged experts. Their testimony in favor of Dr. Cole followed the established pattern. In this connection it is also interesting to note that plaintiff appeared in the trial court for two days, under direct and cross-examination, and both the presiding judge and the jury of her peers possessed an excellent opportunity to evaluate her sanity. But, even if the existence of a psychosis had been established, in my opinion we would only consider that fact in mitigation of damages. It has nothing whatsoever to do with Dr. Cole's *584 legal right, under either act, to commit plaintiff to a mental institution without a prior personal examination. If the plaintiff was insane as the experts, in their zealous effort to defend Dr. Cole, would have us believe, by virtue of weak and evasive testimony, then why has this court devoted thirty pages to an opinion reasoning that Act 303 of 1944 was unconstitutional, and that Act 34 of 1926 permitted the coroner to commit plaintiff to a mental institution without having examined her in person, and that Dr. Cole acted as a typical prudent doctor would have acted under the same circumstances. The answer is too obvious to require further comment.
But, be that as it may, compare and, if possible, reconcile the foregoing effort by the Court to free Dr. Cole from liability, with the following conclusions of the court which pronounced the liability of Edward O'Rourke to plaintiff.
"It appears from the record that for many years this defendant and his sister, the plaintiff, had been very hostile towards each other, but the record convinces us that only to a slight extent was the plaintiff responsible. Most of the difficulties in which Edward J. O'Rourke found himself were of his own making and apparently his sister did nothing more than to attempt to help him straighten out his difficulties, though on several occasions she made charges against him and on one occasion had him placed under a peace bond. We think it charitable not to discuss in detail the actions of Edward J. O'Rourke, but merely to state that we reach the conclusion that in this situation he acted with malice and without probable cause. The necessary consequence is that he is responsible for such damage as his sister sustained." (Italics mine.)
The court's opinion complains of the exclusion by the trial judge of certain evidence relating to the prevailing custom of Dr. Cole and his predecessors in that office to issue commitments to incarcerate persons in the Mental Hospital only on the basis of what "responsible persons" think is a case of insanity. If Dr. Cole was a prudent coroner, could he have reasonably believed that O'Rourke, based on his interview of him alone, was a "responsible person"? The record shows O'Rourke to be a disreputable character. In any event, I do not believe that a consideration by us, of this alleged custom, matters one way or the other when positive law exists which encompasses the subject matter in its entiretyeither Act 34 of 1926 or Act 303 of 1944. I do believe, however, as an academic piece de resistance that it was properly excluded. It is for ordinary minds and not psychoanalysts that our rules of evidence were formulated.
But if we must discuss the prevailing custom and what Dr. Cole actually believed this to be read the words forming the context of the certificate of his commitment of plaintiffthen all doubt thereof is obliterated.
I am of the opinion that Act 303 of 1944 is not unconstitutional. The plea of unconstitutionality arises because the Legislature, in enacting this statute, simply omitted the words "Be it enacted by the Legislature of Louisiana." Section 7 of Article 3 of the Constitution providing for this enacting clause is, in my opinion merely directory and not mandatory. No fundamental rights were intended to be protected by this provision and I fail to recognize a cogent reason upon which to declare an act of the Legislature unconstitutional simply because it lacks such a clause. In this connection see City of Shreveport v. Dale, 149 La. 439, 89 So. 408; State v. Harris, 47 La.Ann. 386, 17 So. 129.
In the case of In re Bryant, 214 La. 573, 38 So.2d 245, the Supreme Court discussed several sections of Act 303 of 1944 and finally based its opinion solely on the provisions of that act, under which the plaintiff therein was committed.
*585 However, assuming arguendo that the act is unconstitutionala view which they think most favorable to the validity of the court's opinion, then I am of the opinion that defendant, Dr. Cole, is liable by virtue of the express provisions of Act 34 of 1926, as I have related elsewhere hereinabove, especially when considered in connection with the certificate of commitment which he must have issued under the authority of one act or the other. If Dr. Cole failed to act in conformity with either act, then he acted without color of authority, and is, therefore, under this hypothesis also liable.
I said initially that I believed that Dr. Cole's actions in issuing a commitment without personally examining plaintiff and having her summarily picked up from her home at midnight, by two uniformed policemen, and incarcerated in the City Hospital for the mentally diseased, where she experienced excruciating mental and physical pain and anguish, was both legally and morally wrong. I have elucidated hereinabove upon the legal reasons therefor. In my opinion the moral wrong was his failure to observe, as coroner, the office of which must be held by a doctor of medicine, the "Hippocratic Oath" which is the foundation of medical ethics. One version thereof reads in part as follows:
"I swear by Appollo, the physician and Aesculapius, and Hygira, and Panacea, and all the gods and all the goddesses and I make them my judgesthat this mine oath and this my written engagement I will fulfill as far as power and discernment shall be mine.
"* * * I will carry out regiment for the sick and will keep them from harm and wrong * * *.
"And now if I shall fulfill this oath and break it not, may the fruits of life and art be mine, may I be honored of all men for all time; the opposite if I shall transgress or be forsworn."